[No. 50385–1. En Banc. September 19, 1985.]

THE STATE OF WASHINGTON, *Respondent*, v.
MARIO ORTIZ, *Petitioner.*

*Raymond H. Thoenig* of *Washington Appellate Defender Association,* for petitioner.

*David S. McEachran, Prosecuting Attorney,* for respondent.

GOODLOE, J.—On June 2, 1981, Virginia Martin of Othello, Washington, called the Othello Police Department and requested that an officer be sent to her home. For the past hour there had been a male walking up and down the alley located behind Martin's residence. He had been walking up to her car that was in her carport and staring at her house. It is unclear whether Martin told the police that the person had entered her property.

Officer Roger Schell responded to the call and received a description of the man from Martin. He spotted the man approximately one and a half blocks away from Martin's residence. At this time, the individual, later identified as petitioner, Mario Ortiz, saw Officer Schell and immediately started running. Officer Schell pursued petitioner through a number of yards. During this time Officer Schell repeatedly told petitioner to halt; petitioner did not comply with the order. Officer Schell eventually caught petitioner and arrested him. Petitioner was then taken to the Othello City Jail by Lieutenant Robert Hampton. During the trip to the jail, petitioner stated: "I didn't want to screw the old lady, she wanted to screw me." Report of Proceedings, at 250. This statement was made without any solicitation from Lieutenant Hampton. At this time, petitioner had not been informed of his *Miranda* rights. *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.2d 974 (1966).

At the time of his arrest, petitioner was a suspect in a crime that took place in Whatcom County. The crime involved the rape and murder of a 77–year–old woman. Detectives of the Whatcom County Sheriff's office traveled to Othello and interviewed petitioner after first advising him of his rights. Detective Don McSwain informed petitioner that they had a palm print at the scene of the crime. Petitioner replied: "You couldn't of. I wore gloves." Supplemental Report of Proceedings, at 64. Detective McSwain also told petitioner that he saw bloodstains on his shoes. Petitioner said that there weren't any bloodstains on his shoes because he had cleaned them off. When asked to

explain that further, he said that he had stepped in a mud puddle and that there weren't any bloodstains on his shoes.

McSwain asked petitioner how he would have done this crime if he had committed it. Petitioner paused for a moment, then made a slashing motion across his left arm and said the victim would have had a wound there. He indicated that he would have stabbed her in her stomach and in her throat so that she could not talk. McSwain noticed that petitioner's descriptions corresponded to the wounds found on the victim's body.

McSwain asked petitioner what he would tell his parents about the blood that would be on him. Petitioner said that that would be no problem as he would tell them that he got a bloody nose. Petitioner said he would lie to his parents, and to the police, to prevent being caught. Petitioner also stated that if he had done this, there would have been no blood on his shoes but there would have been blood on his clothes and, gesturing with his hands, indicated that blood would have been all the way up on the wall at approximately a 5–foot level. This corresponded to the bloodstains at the victim's residence.

Petitioner was returned to Whatcom County and was found competent to stand trial. On November 10, 1981, petitioner was convicted of aggravated first degree murder. In May of 1983, the Court of Appeals, Division One, reversed petitioner's conviction and remanded for a new trial. *State v. Ortiz*, 34 Wn. App. 694, 664 P.2d 1267 (1983) (rebuttal evidence improperly admitted at trial).

Following the remand, the trial court held a second competency hearing and once again determined that petitioner was competent to stand trial. Petitioner was again convicted of aggravated first degree murder but the trial court declared a mistrial, based on juror misconduct. Apparently, some of the jurors failed to admit, until after the trial, that they had heard about the result in the petitioner's first trial.

The State filed the aggravated first degree murder charge a third time. Petitioner moved to have his statement that

was given during his ride to the jail suppressed. (The State does not appeal the trial court's decision to exclude petitioner's statements made in response to the questions asked by Detective McSwain.) Petitioner also moved to have all evidence seized from the arrest suppressed arguing that his arrest for trespass was illegal. The trial court denied both motions. Petitioner appealed directly to this court claiming that the trial court erred in its rulings. We granted review in order to resolve these issues before defendant's third trial.

## COMPETENCY

The trial court has wide discretion in judging the mental competency of a defendant to stand trial. *State v. Dodd,* 70 Wn.2d 513, 424 P.2d 302, *cert. denied,* 387 U.S. 948 (1967). Accordingly, a trial court's decision will not be reversed unless it has abused its discretion. *See State v. Gwaltney,* 77 Wn.2d 906, 468 P.2d 433 (1970).

Neither party contests the following facts. Petitioner has an IQ that ranges from 49 to 59, which places him in the category of mildly retarded. He knows that the flag is red, white and blue, that there are 12 months in a year, and that a thermometer shows how hot it is. He does not know, however, what the shape of a ball is or where rubber comes from. He cannot name four presidents, he thinks Longfellow was Jesus, and thinks that there is 1 day in a week. He has a speech impediment that affects his ability to speak. This speech impediment, however, does not prevent him from being able to communicate. Petitioner also alleges that it is very difficult, if not impossible, for him to remember past events.

In Washington, a person is competent to stand trial if he has the capacity to understand the nature of the proceedings against him and if he can assist in his own defense. RCW 10.77.010(6) and RCW 10.77.050. *See also State v. Wicklund,* 96 Wn.2d 798, 638 P.2d 1241 (1982). The trial court found that petitioner meets both those requirements. The court found that petitioner understands that there is a

judge in the courtroom, that a prosecutor will try to convict him of a criminal charge, and that he has a lawyer who will try to help him. In addition, the trial court found that petitioner has the ability to recall past facts and can relate these facts to his attorney. Petitioner implicitly contests these findings. The testimony, however, of an expert witness, Dr. Brett Trowbridge, provides substantial support for the trial court's findings. Further, Detective McSwain's testimony shows that petitioner can relate past events which would be useful in assisting his attorney in the defense.

Instead of arguing that the trial court erred in its application of the facts to the traditional analysis for competency, petitioner argues that *State v. Jones,* 99 Wn.2d 735, 664 P.2d 1216 (1983) added another requirement to the competency test: Petitioner must be able to suggest a particular trial strategy. *Jones* held that a defendant must have the same competency level to stand trial as he does to waive the insanity defense. *Jones* further held that in order to waive the insanity defense, a defendant must be able to assist in his own defense which requires that he has the ability to "choose among alternative defenses". *Jones,* at 746. Petitioner uses this language to argue that a person must be able to help with trial strategy in order to be found competent to stand trial. Since the trial court found that petitioner does not have the ability to consult on trial strategy, petitioner argues that he is not competent to stand trial.

Petitioner is reading *Jones* too broadly. *Jones* was concerned with the issue of when a defendant can waive an insanity defense and not with the issue of competency to stand trial. Thus, *Jones* never made the test for competency more stringent as petitioner is now suggesting. While it is true that a defendant must be able to choose among alternative defenses in order to waive the insanity defense, the same is not true regarding competency to stand trial. Consequently, we hold that the trial court was correct in using the traditional analysis for determining competency

and thus did not abuse its discretion in finding that petitioner was competent to stand trial. We note that other jurisdictions have held persons with similar IQ's competent to stand trial. *See* Annot., *Competency To Stand Trial of Criminal Defendant Diagnosed as "Mentally Retarded"— Modern Cases,* 23 A.L.R.4th 493 (1983).

## PETITIONER'S STATEMENT

On the way to the police station, after being arrested without anything being said by the officer transporting him, petitioner stated: "I didn't want to screw the old lady, she wanted to screw me." Report of Proceedings, at 250. Petitioner had not been advised of his *Miranda* rights. Petitioner claims that this statement was not voluntarily made.

The general rule is that a statement is voluntary if it is made spontaneously, is not solicited, and not the product of custodial interrogation. *State v. Miner,* 22 Wn. App. 480, 591 P.2d 812 (1979). It is undisputed that petitioner's statement satisfies the criteria. Petitioner, however, argues that a person of low IQ can never give a voluntary statement. We disagree.

■ A confession must be made freely and without inducement or compulsion before it may be admitted as evidence against a defendant. *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336 (1963). A court will look to the totality of the circumstances to determine whether a confession was made voluntarily. *Fikes v. Alabama,* 352 U.S. 191, 1 L. Ed. 2d 246, 77 S. Ct. 281 (1957). The mental subnormality of an accused does not automatically render his or her confession inadmissible; instead, it is merely one factor to be considered with all others bearing on the question of voluntariness. *People v. Lara,* 67 Cal. 2d 365, 432 P.2d 202, 62 Cal. Rptr. 586 (1967). Looking at the totality of the circumstances, we find that petitioner's statement was voluntarily made. The dispositive fact here was that the admission by petitioner was completely unsolicited. Absolutely nothing was said in the car before petitioner made his admission. We hold that in this situation

the fact that petitioner was moderately retarded is irrelevant to the issue of voluntariness.

## The Arrest

When Martin called the police it is unclear whether she told them that petitioner had actually entered her property and thus committed the crime of trespass. That fact, however, is irrelevant as the police cannot arrest a person without a warrant for a misdemeanor unless it is committed in their presence. RCW 10.31.100. Criminal trespass is a misdemeanor. RCW 9A.52.080. Thus, the police could not lawfully arrest petitioner even if Martin told them he had trespassed unless they first secured a warrant, which they did not.

The arrest was valid, however, for another reason. When petitioner first saw the police officers he started running. The police chased him and petitioner ran through a number of yards and crossed a number of fences. Thus, he committed a misdemeanor (trespass) in the presence of the police officers, and the officers had probable cause to arrest him. RCW 10.31.100. Further, when he struggled he resisted arrest and thus obstructed a public servant. RCW 9A.76.020. Accordingly, we hold that the arrest was lawful.

## Conclusion

We uphold the trial court's finding that petitioner is competent to stand trial, that his admission was voluntarily made, and that his arrest was lawful. We take this time, however, to express our dissatisfaction with the mandatory sentencing provision in the aggravated first degree murder statute, RCW 10.95. Unlike the Sentencing Reform Act of 1981, RCW 9.94A, which allows the trial judge to depart from the prescribed sentencing range when the prescribed sentence would impose excessive punishment on a defendant, the aggravated first degree murder statute allows for no such flexibility. Instead, it mandates that

> any person convicted of the crime of aggravated first degree murder shall be sentenced to life imprisonment without possibility of release or parole. A person sen-

486

tenced to life imprisonment under this section shall not have that sentence suspended, deferred, or commuted by any judicial officer . . .

RCW 10.95.030(1). Thus, if petitioner is convicted of first degree aggravated murder, the trial court will have no choice but to sentence him to life imprisonment without the possibility of parole despite the fact that he has an IQ that ranges from 49 to 59 and committed the crime while he was in his early 20's. We feel that such a sentence is not appropriate for petitioner. We believe that if the Legislature amended RCW 10.95 so as to provide the trial court with some latitude in sentencing as it has done in the sentencing reform act, then justice would be better served. Justice to fit each individual should not, and need not, be sacrificed in the quest for uniform sentences.

We affirm the trial court's ruling.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, CALLOW, and DURHAM, JJ., concur.

ANDERSEN, J., concurs in the result.

Reconsideration denied March 12, 1986.