STATE OF NEBRASKA, APPELLANT, V. LARRY DICKSON, APPELLEE.

389 N.W.2d 785

Filed July 3, 1986.   No. 86-272.

Stephen L. Von Riesen, Hall County Attorney, for appellant.

D. Steven Leininger and Daniel M. Placzek of Luebs, Dowding, Beltzer, Leininger, Smith & Busick, for appellee.

WHITE, J.

From the Hall County District Court's order sustaining the defendant's motion to suppress, the State brings an interlocutory appeal, pursuant to Neb. Rev. Stat. § 29-116 (Reissue 1985), before a single judge of this court. Dickson argued successfully to the district court that certain statements he had made to individuals, both police and civilians, were inadmissible because they were involuntary. The district court found that the State had "failed to prove by a preponderance of the evidence, that Def's statements were a product of a rational intellect." The court made no other findings of fact. The State timely appealed from the order.

The relevant facts are as follows. On January 8, 1984, Larry Dickson walked into the Grand Island, Nebraska, Police Department and requested assistance for his mother. The police secretary asked Dickson why his mother needed help, to which Dickson replied, "I think she is dead. . . . I'm not going to say anymore until I talk to an attorney." After police Sergeant Antonson instructed Dickson to go home and check on his

mother, Dickson called the police department and again requested assistance for his mother. The 911 emergency operator testified that Dickson identified himself and then said that he might be responsible for the death. Asked to explain, Dickson stated that first he would need to talk to an attorney.

An ambulance staffed by paramedics Kevin Badgley and Ray Faz arrived at Dickson's house a few minutes after the call. After verifying that the female inside the house was dead, Badgley asked Dickson for biographical information on her. Dickson responded that he should not say anything until he saw a lawyer. He also said that he may have been the cause of his mother's death.

On January 13, 1984, Dickson was charged with one count of first degree murder. On the same day, two sheriff's deputies transported him to the St. Joseph Center for Mental Health in Omaha, Nebraska, for psychiatric evaluation. Deputy Dahlke testified that Dickson had initiated a conversation with him during the evening of January 13 after Dickson had been admitted to the hospital, heavily sedated, and securely strapped to a bed. Dahlke stated that Dickson was groggy and sometimes incomprehensible. He also stated that Dickson asked the deputy if he was aware how many people were alive in the defendant's family. When Dahlke responded that he had heard about Dickson's family, Dickson asked the deputy to tell them "I'm sorry about that."

Three days later, Dickson was moved to the Lincoln Regional Center. While there, Dickson asked to talk with his brother, Robert Dickson. Robert testified that during their telephone conversation on January 24, 1984, Larry said that "they had his mind messed up down there." Robert also asked Larry if the latter realized what he had done to the family. Larry said that he was sorry and that he did not wish to discuss it further. Robert Dickson's second conversation with his brother took place on February 24, 1984, at the Hall County jail. This conversation was, in substance, the same as the one in January; Larry again apologized and refused to talk about their mother's death.

The district court subsequently found on July 17, 1984, that Dickson was mentally incompetent to stand trial. Slightly more than 1 year later, on September 30, 1985, the court found that

Dickson was competent to stand trial.

In his motion Dickson seeks to suppress his statements to the police secretary, the 911 operator, the deputy, Sergeant Antonson, whose testimony reflected that of the secretary, and the paramedic. He also seeks to suppress the statements to his brother. The district court granted the motion and suppressed all of Dickson's statements, finding them involuntary because the State had failed to prove by a preponderance of the evidence that they were the product of a rational intellect.

The State argues that the district court erred in suppressing the statements. The heart of the State's position is that voluntariness is a due process standard utilized to determine whether a defendant's statements should be excluded because another person improperly induced, coerced, or overcame the accused's will, so that the statements were not the result of free choice or the product of a rational intellect. Since inducements, threats, and coercion were not present in this case, Dickson's volunteered statements and answers to noninterrogative questions are not suppressible as involuntary.

The State's argument in its brief proceeds along two lines. First, the State contends that Dickson's statements to the police secretary, 911 operator, paramedic, deputy, and police sergeant were unsolicited and totally voluntary; therefore, the general rule that voluntary statements are admissible applies. Second, the State posits that Dickson's statements to his brother, which were in response to questioning, should be evaluated by the traditional voluntariness standards established by the U.S. Supreme Court and this court. The standard involves a totality of the circumstances test in which Dickson's mental illness is but one factor in determining the voluntariness of his statements.

Dickson counters that the voluntariness of any defendant's statement focuses on whether the statement was the product of a free will and a rational mind. He argues that an inculpatory statement made by one who is mentally ill is as involuntary as is one resulting from threats, inducement, or coercion. Lacking the power of rational thought, a mentally ill defendant perforce is incapable of making statements which are the product of rational intellect, even when inducements, threats, and coercion are not at issue. The defendant further argues that

statements of this kind are inherently unreliable, have no probative value, and offend the principles of our system of justice.

The State bears the burden in a suppression hearing to show by a preponderance of the evidence that the accused's statements were voluntary and, therefore, admissible. *State v. Irwin*, 191 Neb. 169, 214 N.W.2d 595 (1974); *Lego v. Twomey*, 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972). To be admissible a statement, confession, or admission must have been freely and voluntarily made, and must not have been extracted by any direct or implied promise or inducement, no matter how slight. *State v. Dixon*, 222 Neb. 787, 387 N.W.2d 682 (1986). Whether a statement, admission, or confession has been freely and voluntarily made depends upon the totality of the circumstances, and a finding by the trial court regarding voluntariness will not be set aside unless clearly wrong. *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985).

The crux of the State and Dickson's disagreement is in language by the U.S. and Nebraska Supreme Courts articulating a test for voluntariness. Justice Frankfurter defined "voluntary" in *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961):

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, *if his will has been overborne and his capacity for self-determination critically impaired*, the use of his confession offends due process.

(Emphasis supplied.)

This court cited Justice Frankfurter's language with approval in *State v. Bodtke, supra*, after which we went on to say that "the most meticulous explanation of constitutional rights will not make a statement voluntary . . . if an accused lacks sufficient powers of reason." *Id*. at 510. Dickson interprets this statement to mean that a volunteered inculpatory statement of a mentally ill defendant is transformed, by virtue

of the defendant's inability to make *any* statements which are the product of rational intellect, to an involuntary, inadmissible statement.

The defendant's reading of *Bodtke* is not what the opinion intended or achieved. We went on in *Bodtke* to say at 510-11, 363 N.W.2d at 922:

> Use of an accused's involuntary statement, whether admission or confession, offends due process and fundamental fairness . . . *because one acting with coercion, duress, or improper inducement transports his volition to another who acts in response to external compulsion, not internal choice.* . . . [T]he focal point of inquiry into voluntariness is whether the statement is "the product of a rational intellect and a free will." [Citations omitted.]

(Emphasis supplied.)

The case law, both state and federal, supporting this proposition was limited to situations involving police interrogation of some sort. See, *Blackburn v. Alabama*, 361 U.S. 199, 80 S. Ct. 274, 4 L. Ed. 2d 242 (1960) (mentally ill defendant's subjection to 9 hours of interrogation by police which produces confession offends due process); *Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963) (responses of drug addict defendant to questions asked while in custody and after he inadvertently had been given "truth serum" drug held inadmissible). At issue in *Bodtke* was whether inculpatory statements made to private citizens, not the police, must also be voluntary to be admissible, a related issue in this case, since some of the witnesses were not police department personnel. We held that such statements must be voluntary to be admissible. Clearly, *Bodtke* used the "free will" and "product of rational intellect" language in the context of police and private coercive activity with the accused.

In addition to being overly broad, Dickson's interpretation of *Bodtke* is one that other courts seem unwilling to embrace. In *State v. Ortiz*, 104 Wash. 2d 479, 706 P.2d 1069 (1985), the Washington Supreme Court held that a defendant's mental subnormality does not automatically render a confession inadmissible in a criminal proceeding but, rather, is one factor

to be considered with all others bearing on voluntariness. In *Ortiz* the defendant was arrested for prowling. In the police car, the defendant stated, "I didn't want to screw the old lady, she wanted to screw me." 104 Wash. 2d at 484, 706 P.2d at 1072. Ortiz was a suspect in an earlier rape and murder of a 77-year-old woman, but he had been neither apprehended nor previously questioned about the crime. His outburst was not in response to questioning by police; indeed, "[i]t is undisputed that petitioner's statement [was] . . . made spontaneously, [was] not solicited, and [was] not the product of custodial interrogation." *Id.*

The Washington court further stated: "[T]he fact that petitioner was moderately retarded is irrelevant to the issue of voluntariness." 104 Wash. 2d at 485, 706 P.2d at 1073. Considered in light of the totality test, this statement is somewhat broad. Mental illness, like age, education, and intelligence, is a relevant factor in the totality test. See *State v. Erks*, 214 Neb. 302, 333 N.W.2d 776 (1983). However, no per se rule invalidates the volunteered statement of a mentally ill defendant. Such statements are subject to the general rule that a statement freely and voluntarily given without any compelling influences is admissible. *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). The *Ortiz* court found the unsolicited nature of the statement to be the "dispositive fact" in admitting the statements into evidence. See, also, *Berlanga v. State*, 696 S.W.2d 425 (Tex. App. 1985) (no per se rule); *State v. Damiano*, 124 N.H. 742, 474 A.2d 1045 (1984) (no per se rule); *People v. Lara*, 67 Cal. 2d 365, 432 P.2d 202, 62 Cal. Rptr. 586 (1967) (no per se rule).

The district court's language in its order reflects a standard that is appropriate in fact situations where police or private inducement, coercion, or suggestion potentially taints a confession or admission, facts not present in this case.

Upon reconsideration the district court should analyze the evidence of Dickson's mental capacity at the time he made the statements, using the totality of the circumstances test.

REVERSED AND REMANDED.