IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. UEDING-NICKEL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CARL UEDING-NICKEL, APPELLANT.

Filed November 24, 2015.    No. A-15-210.

Appeal from the District Court for Douglas County: GREGORY M. SCHATZ, Judge.
Affirmed.

Matthew R. Kahler, of Finley & Kahler Law Firm, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

PIRTLE, Judge.

### INTRODUCTION

Carl Ueding-Nickel appeals his conviction and sentence for the charge of Sexual Assault of a Child in the First Degree, a Class IB felony. Ueding-Nickel asserts the trial court erred in denying the motion to suppress his statements to police following his arrest and in ordering an excessive sentence. For the reasons that follow, we affirm.

### BACKGROUND

On January 19, the Omaha Police Department received a call from J.R., Ueding-Nickel's girlfriend at the time, reporting that she had found naked pictures of her 11-year-old daughter on Ueding-Nickel's phone. Officers were dispatched to the residence J.R. and Ueding-Nickel shared to investigate the reports of sexual assault on the child, O.R. J.R. reported that after the photographs

were discovered, Ueding-Nickel and J.R. were involved in a domestic disturbance, and both Ueding-Nickel and the child fled, on foot, from the home. Ueding-Nickel was arrested at approximately 2 a.m. at a convenience store and was taken to police headquarters and placed in an interview room at approximately 2:30 a.m. The video provided shows that Ueding-Nickel remained alone until Sergeant Lance Worley of the Omaha Police Department arrived for an interview at approximately 5:23 a.m.

During the period between 2:30 and 5:23 a.m., Ueding-Nickel interacted with several police officers who conducted a search of his person. He was compliant and followed the officers' directions during the search, and left the interview room to use the restroom without incident. Ueding-Nickel changed positions several times in his seat, appearing, at one point, to fall asleep. Eventually he got out of his seat and lay down on the floor. When Worley entered, he observed Ueding-Nickel asleep on the floor. He asked Ueding-Nickel to get up and sit in the chair by the table, and Ueding-Nickel complied. Worley informed Ueding-Nickel of the investigation and the purpose for the interview. Worley advised Ueding-Nickel of his *Miranda* rights, and Ueding-Nickel verbally responded that he understood his rights, verbally agreed to speak with Worley, and provided background information regarding his educational background, employment history, and past and current residences.

Worley asked Ueding-Nickel if he was under the influence of drugs or alcohol, a standard question Worley asks before conducting an interview. Ueding-Nickel claimed that he had consumed five beers and 12 shots the day before. Worley noted that Ueding-Nickel did not appear to be intoxicated; he responded to the questions appropriately and quickly without hesitation, he did not appear to misunderstand the questions, and he was easy to converse with. Worley asked Ueding-Nickel if he felt clear-headed and able to answer his questions and Ueding-Nickel said yes, and stated that he was fine.

Ueding-Nickel told Worley that he and J.R. had been in a relationship for about five years, and they had differing work schedules, which meant he was often at home alone with O.R. He indicated that his relationship with O.R. had grown, and he began substituting O.R. for J.R. and they developed a sexual relationship. Ueding-Nickel indicated that the relationship with O.R. began when she was 10 or 11 years old, and that it had been going on for 13 to 14 months. He stated that it began with kissing on the mouth and progressed to back rubs and tickling.

Ueding-Nickel indicated that the week prior to the interview was the first and only time that he had penetrated her vagina with his penis. He stated that O.R. had performed oral sex on him approximately three times, and the he had performed oral sex on O.R. approximately a dozen times. He indicated he had encounters with O.R. roughly once per week, sometimes more, and sometimes less. He stated that he had not threatened or bribed O.R. to get her to participate in the encounters, and that the encounters took place both when he was sober, and when he was intoxicated. Ueding-Nickel stated that he knew treating O.R. "like she was [his] girlfriend" was wrong, but that he intended for the relationship to continue until O.R. was older. He estimated that he had more than 100 encounters with O.R. over the 13 or 14 month period from the time the contact began, until the night he was arrested.

Ueding-Nickel stated that the photos of O.R., discovered on his phone by J.R., were taken with the camera on his phone the previous weekend. He had taken four pictures; one of O.R.'s vagina, one of O.R.'s "boobs," one of O.R. "sucking [his] wiener," and one picture of his "wiener

next to her vagina." Ueding-Nickel stated that he took the photos on a whim, and knew it was risky if he got caught. He also expressed surprise that O.R. had participated and allowed him to take the photos.

Ueding-Nickel told Worley that he was not sure how J.R. found the photos. He said he had been sleeping in the basement when he was awakened by loud yelling and heard J.R. tell O.R. to get dressed and get in the car. He said he found J.R. locked in her vehicle, so he smashed the driver's side window with a brick and took his phone from her hand. He said he threw the phone to the ground, used a landscaping brick to smash it, and then threw it as hard as he could toward the barrier wall near Interstate 80. He stated that he left the home on foot, walked someplace where he could buy and drink a beer and a shot, then turned himself in to police officers at a convenience store.

Ueding-Nickel's attorney filed a motion to suppress on May 7, 2014, seeking to suppress any and all statements he made to Omaha Police officers on or about January 20, 2014. Specifically, he sought to suppress the statements he made to Worley, while in the custody of the police department. He asserted the statements were not knowingly, understandingly, and intelligently made, they were not freely and voluntarily given, and they were made without a "proper knowing, understanding, and intelligent waiver of her [sic] rights against compulsory self-incrimination or his right to counsel." He asserted the statements were a result of words or actions that the police should have known were likely to elicit an incriminatory response, and they were the product of "threats, coercion, deception, and/or inducements by members of the Omaha Police Department." He further asserted the statements were the fruit of a custodial interrogation, and of an unlawful arrest "made without warrant or probable cause to believe the Defendant had committed a criminal offense."

Ueding-Nickel's motion was heard before the district court on July 18, 2014. Worley testified at the suppression hearing, and a DVD recording of the interview was entered into evidence. Worley testified that he had been in law enforcement for over 25 years and that, during that time, he had significant experience with DUI investigations, had been a DUI instructor for approximately 2 years, and he had experience evaluating levels of intoxication. Based on his experience, and Ueding-Nickel's behavior, Worley was of the opinion that Ueding-Nickel was not under the influence of drugs or alcohol at the time of the interview. Worley testified that he did not think a breath test was necessary, and that Ueding-Nickel's behavior did not match that of someone who had consumed five beers and 12 shots. Worley testified that he did not have any concerns regarding Ueding-Nickel's mental health, and Ueding-Nickel did not make any statements regarding mental health.

The court found no evidence that Ueding-Nickel was intoxicated, or that his statements were not freely and voluntarily given, or the result of improper or undue influence by Officer Worley. The court found there was no evidence that Ueding-Nickel's arrest was unlawful, and the court denied the motion to suppress his statement.

Following a stipulated bench trial, the court found the State proved Ueding-Nickel guilty, beyond a reasonable doubt, of the charge of first degree sexual assault of a child. The court specifically found that "the defendant did in fact engage in sexual penetration, digital and penile penetration into the vagina and the mouth of the victim in this case" during the time charged in the second amended information while the victim was under the age of 12, and Ueding-Nickel was 19

- 3 -

years of age or older. The court found Ueding-Nickel's statement was voluntary, and there was no evidence of intoxication.

The court ordered a presentence investigation and Ueding-Nickel appeared for sentencing on February 10, 2015. The court considered the length of time that Ueding-Nickel participated in sexual contact with the victim, the number of sexual contacts, the age of the victim, and Ueding-Nickel's refusal to accept responsibility for what he had done into account in determining his sentence. The court also considered Ueding-Nickel's history of alcohol use and his diagnosed mental disorders. Ultimately, the court sentenced Ueding-Nickel to a period of incarceration of not less than 50 years nor more than 60 years, and he was given credit for 387 days already served.

## ASSIGNMENTS OF ERROR

Ueding-Nickel asserts the trial court erred in overruling his motion to suppress and in imposing an excessive sentence.

## STANDARD OF REVIEW

In reviewing a motion to suppress a confession based on the claimed involuntariness of the statement, an appellate court applies a two-part standard of review. *State v. Turner,* 288 Neb. 249, 847 N.W.2d 69 (2014). With regard to historical facts, an appellate court reviews the trial court's findings for clear error. *Id.* Whether those facts suffice to meet the constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Casares,* 291 Neb. 150 864 N.W.2d 667 (2015).

## ANALYSIS

*Motion to Suppress.*

Ueding-Nickel asserts the district court erred in denying his motion to suppress the statement made to Worley on the night of his arrest. Ueding-Nickel asserts the statement was not made voluntarily because it was the "product of both his mental health and his extreme level of intoxication."

A statement of a suspect, to be admissible, must be shown by the State to have been given freely and voluntarily and not to have been the product of any promise or inducement--direct, indirect, or implied--no matter how slight. *State v. Bormann,* 279 Neb. 320, 777 N.W.2d 829 (2010). This rule is not to be applied on a strict, per se basis, rather, determinations of voluntariness are based upon an assessment of all of the circumstances and factors surrounding the occurrence when the statement is made. *Id.*

This court has found that the mere fact of intoxication is not conclusive on the issue of voluntariness of a statement or a consent given by a defendant. *State v. Sanders,* 15 Neb. App. 554, 733 N.W.2d 197 (2007). A defendant must be so intoxicated that he is unable to understand the meaning of his statements. *Id.* Mental illness, like age, education, and intelligence, is a relevant factor in the totality test. *Id,* citing *State v. Dickson,* 223 Neb. 397, 389 N.W.2d 785 (1986). However, no per se rule invalidates a volunteered statement of a mentally ill defendant. *Id.* Such

statements are subject to the general rule that a statement freely and voluntarily given without compelling influences is admissible. *Id.*

The district court's determination regarding Ueding-Nickel's motion to suppress was based upon Worley's testimony at the hearing, and upon viewing the videotaped interview. The video footage begins at roughly 2:30 a.m. when Ueding-Nickel was placed in a cell following his arrest. Ueding-Nickel remained in the cell for approximately three hours prior to Worley's arrival, and during that time he interacted with various employees of the Omaha Police Department. The video shows that he complied with the officers' directions during a search of his person. In the course of the search, he was asked to take off his shoes and put them back on, shift his weight so officers could search his pant legs, and lean forward slightly so officers could remove his handcuffs. He did not demonstrate difficulty completing the tasks that were requested, or difficulty understanding what was asked of him. When Worley arrived, Ueding-Nickel immediately awakened and complied with Worley's request to sit in a chair to begin the interview. The video shows Worley advised Ueding-Nickel of his *Miranda* rights, and Ueding-Nickel communicated his understanding.

Worley testified that he routinely asks whether suspects are under the influence of alcohol or drugs, and the video shows he asked Ueding-Nickel that question. Ueding-Nickel claimed that he had consumed five beers and 12 shots the previous day, and Worley inquired regarding Ueding-Nickel's state of mind. Ueding-Nickel stated that he was clear-headed and felt capable and willing to continue the interview. Ueding-Nickel did not appear to have difficulty understanding Worley's questions, and his responses were prompt and spoken clearly. He was able to account for his whereabouts and actions during the relevant time period, from the beginning of the altercation with J.R., until he turned himself over to police at the convenience store. Ueding-Nickel stated that he knew he was engaging in risky behavior by having sexual contact with O.R. and by taking sexually explicit photos of her on his phone. He was able to recount, without difficulty, his biographical information, residential and employment history, relationship history, and details of various inappropriate or sexual encounters with O.R.

Worley testified that he had many years of law enforcement experience, and substantial experience with DUI investigations. He testified that in his opinion, Ueding-Nickel's behavior was not consistent with that of an intoxicated person, as he responded without hesitation, he did not appear to misunderstand the questions and he was easy to converse with. Worley testified that he determined a breath test was not necessary. The only evidence of possible intoxication was Ueding-Nickel's statement that he had consumed alcohol the previous day, and a possible "very slight" odor of alcohol. However, the totality of the evidence supports the district court's finding that Ueding-Nickel was not intoxicated, especially that he was not intoxicated to the point of not being able to understand the meaning of his statements.

Worley also testified that he did not have any concerns regarding Ueding-Nickel's mental health. Ueding-Nickel did not make any statements regarding his own mental health during the interview, and he did not present any evidence at the suppression hearing to suggest there was a mental health issue that needed to be taken into account.

In determining the correctness of a trial court's ruling on a suppression motion, an appellate court will accept factual determinations and credibility choices made by the trial court unless, in light of all the circumstances, such findings are clearly erroneous. *State v. Newman,* 4 Neb. App.

265, 541 N.W.2d 662 (1996). Upon our review, we find the district court considered the evidence before it and reasonably determined that Worley was a credible witness, and the video of Ueding-Nickel showed that he did not appear to be intoxicated or under the influence of alcohol or drugs. Thus, we find the district court's decision to deny Ueding-Nickel's motion to suppress his statement to the Omaha Police Department was not clearly erroneous.

*Excessive Sentence.*

Ueding-Nickel was convicted of the charge of first degree sexual assault of a child, a Class IB felony (See Neb. Rev. Stat. §28-319.01(2) (Cum. Supp. 2014)). The statutory guidelines provide that a Class IB felony is punishable by a maximum of life imprisonment, and a minimum of 20 years' imprisonment. § 28-105 (Cum. Supp. 2014). The statutes also specifically state that the offense of sexual assault of a child in the first degree carries a mandatory minimum sentence of 15 years' imprisonment for the first offense. §28-319.01(2) (Cum. Supp. 2014).

Ueding-Nickel was sentenced to 50 to 60 years imprisonment. Though he acknowledges that the sentence imposed is within the statutory guidelines, he asserts the district court abused its discretion by imposing an excessive sentence.

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Casares,* supra. Where a sentence imposed within statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable principles in determining the sentence to be imposed. *Id.*

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *Id*. The sentencing court is not limited to any mathematically applied set of factors; rather the appropriateness of the sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Stevens,* 290 Neb. 460, 860 N.W.2d 717 (2015).

At the time of sentencing, Ueding-Nickel was 31 years old and his criminal history included traffic offenses and minor criminal offenses for which he was ordered to pay fines. He asserts that his history of physical, sexual, and emotional abuse by his biological parents was ignored by the district court in determining sentencing. He asserts the district court should have also placed greater emphasis on his drug and alcohol history, and the ratings that were assigned to his risk for recidivism. He asserts the district court failed to fully recognize his "circumstances, history, character, and lack of criminal history," thus the district court abused its discretion.

The record demonstrates that Ueding-Nickel engaged in sexual contact with O.R. for approximately 13 or 14 months, beginning when she was approximately 10 years old. He estimated they had sexual contact, consisting of kissing, tickling, touching, oral sex, digital penetration, and intercourse, and upon his arrest he admitted to photographing O.R. in the nude on at least one occasion. At the time of the presentence investigation, Ueding-Nickel had not taken responsibility for his actions, and stated he did not do what he was accused of. He was assigned a "Very High Risk" rating for "Procriminal Attitude/Orientation." At sentencing the State presented statements

from J.R. and O.R.'s family members, which stated that since January 2014, O.R. has withdrawn, cried frequently, suffered from panic attacks, and she attempted suicide on or near her twelfth birthday. Based upon the information in the presentence investigation, the investigating officer believed Ueding-Nickel was a very high risk for community-based interventions, and recommended the court sentence the defendant "to an extensive period of incarceration, above the mandatory minimum and within the statutory penalties" because "anything less than an extensive period of incarceration would depreciate the seriousness of the original offenses and would promote society's disrespect for the law."

The record shows that in determining Ueding-Nickel's sentence the court considered the length of time that Ueding-Nickel participated in sexual contact with the victim, the number of sexual contacts, the age of the victim, and Ueding-Nickel's refusal to accept responsibility for what he had done. The court also considered Ueding-Nickel's history of alcohol use and his diagnosed mental disorders. There is no evidence that the district court considered inappropriate factors in determining the sentence to be imposed. Upon our review, we find the district court did not abuse its discretion in imposing a sentence within the statutory guidelines.

CONCLUSION

We find the denial of Ueding-Nickel's motion to suppress was not clearly erroneous and the district court imposed a sentence within the statutory guidelines and did not abuse its discretion by imposing an excessive sentence.

AFFIRMED.