Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/08/2021 09:08 AM CST

State of Nebraska, appellee, v.
Jeremiah L. Connelly, appellant.
___ N.W.2d ___

Filed October 16, 2020.    No. S-19-1139.

1. **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

2. **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.

3. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** Under the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement after a person has been taken into custody or is otherwise deprived of his or her freedom of action in any significant way.

4. ____: ____: ____. The term "interrogation" under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

5. ____: ____: ____. A police officer's course of inquiry related to and responsive to a volunteered remark by the accused is not "interrogation" for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

6. **Confessions: Appeal and Error.** In making the determination of whether a statement is voluntary, a totality of the circumstances test is applied, and the determination reached by the trial court will not be disturbed on appeal unless clearly wrong.

7. **Confessions: Evidence: Proof.** To meet the requirement that a defendant's statement, admission, or confession was made freely and voluntarily, the evidence must show that such statement, admission, or confession was not the product of any promise or inducement—direct, indirect, or implied—no matter how slight.

8. **Confessions: Mental Competency.** Mental illness, like age, education, and intelligence, is a relevant factor in the totality test when evaluating the voluntariness of a statement.

9. ____: ____. No per se rule invalidates the volunteered statement of a mentally ill defendant. Instead, such statement is subject to the general rule that a statement freely and voluntarily given without any compelling influences is admissible.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Leslie E. Cavanaugh for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Funke, J.

## NATURE OF CASE

The appellant, Jeremiah L. Connelly, filed a motion to suppress in the district court for Douglas County, Nebraska, seeking to have statements he made to law enforcement suppressed in violation of his *Miranda* rights. The district court denied Connelly's motion, finding Connelly's pre-*Miranda* statements

were not made in response to an interrogation and his post-*Miranda* statements were made voluntarily. We affirm.

## BACKGROUND

### INITIAL ARREST

On September 21, 2018, Omaha police officers Kirk Weidner and Mark Pruett were on routine patrol in the area of 90th Street and Bedford Avenue in Omaha, Nebraska. While patrolling the area, Weidner and Pruett observed a car exit a parking lot, cross two lanes of traffic, and run a stoplight. Upon pursuing the car, the officers observed the car parked in an alleyway and saw the driver exit the vehicle and head north. As Weidner and Pruett approached the vehicle, they received information from Omaha police dispatch of a report of a stolen car matching the description of the car they were observing. The officers gave chase on foot and apprehended the fleeing driver, later identified as Connelly.

Sgt. Tammy Mitchell, with the Omaha police's auto theft unit, instructed Weidner and Pruett to transport Connelly to the police station for an interview. Connelly was placed in handcuffs and put in the back of the cruiser, but was not read his *Miranda* rights.

Once Weidner, Pruett, and Connelly arrived at the police station, they waited in the lobby because all of the interview rooms were occupied. In the lobby, Connelly voluntarily provided the officers with information about the auto theft. He told Weidner, "You guys are worried about this petty auto theft when you should be worried about her life." When Weidner asked, "Whose life?" Connelly responded with a name that Weidner did not recognize. Connelly was then turned over to Mitchell for an interview.

### MITCHELL INTERVIEW

Mitchell and a detective entered the interview room where Connelly was seated. Mitchell noticed that Connelly had his jeans rolled up to his knees and that his legs were red and swollen. The interview proceeded as follows:

5:43:19 P.M.

Mitchell: Are you having an allergic reaction, you think?

Connelly: I don't know. It started Monday.

Pruett: He said it was from a sunburn, being outside all day yesterday, and then he said he had (inaudible) in the knees from running, so.

Connelly: No, it's not from running.

Mitchell: Okay, what happened?

5:43:34 P.M.

Connelly: It's from dumping her body in Fremont, that's what it's fucking from. "Mister-I-nearly-record-everything," piece of shit (referring to Pruett, one of the arresting officers). Hero of the fucking day out there, he don't listen to a damn word.

Mitchell: Well, tell me, I'll listen.

Connelly: He wants to give a shit about fucking cars all day dude, who cares about fucking cars?

Mitchell: Nobody does.

Connelly: Jeanna Wilcoxen. J-E-A-N-N-A, dude.

Mitchell: How do you know her?

Connelly: She's in Fremont, that's how I know her.

Mitchell: Okay, what's she doing in Fremont? Is she in danger?

Connelly: You can't help her no more.

Mitchell: What do you mean?

Connelly: She's laying out there. You can fly over and find . . . (interrupted by Mitchell).

Mitchell: What do you mean? She—how do you spell "Jeanna?" J-E-A-N-N-A? Is that right?

Connelly: Wilcoxen.

Mitchell: Is she missing? Do we need to go help somebody—

Connelly: Don't nobody even know dude?

Mitchell: Nobody knows she's missing?

Connelly: That's the fucked up part. . . . They don't even know she's fucking gone.

Mitchell: What do you mean by gone?

Connelly: Like I ain't never getting out of here and just want this shit to stop. I don't know . . . I'll tell you whatever you want to know.

Mitchell: I gotta know if she's safe.

Connelly: I'll tell you whatever you want to know.

. . . .

Connelly: No, it ain't what he said, dude. It's her, dude. It's what I did to her.

Mitchell: Alright, it looks like it. What did you do to her?

Connelly: It's coming back threefold.

Mitchell: What happened?

Connelly: Sunday night. From the laundromat on Q

. . . .

Mitchell: Yeah. Tell me.

Connelly: She just wouldn't listen man.

Connelly: Whatever I do comes back on me three times. (Connelly looks at his swollen legs and says, "Dude, look at that. You ever seen that shit?")

Mitchell: Tell me about Jeanna.

Connelly: She's in Fremont. She's laying there at the end of the road. I don't do drugs.

Mitchell: Alright.

. . . .

Connelly: Half, bunch of her stuff is in Columbus.

Mitchell: Half of her stuff is in Columbus?

Connelly: Just laying out in the truckstop. Some more of it is in South Omaha. Laying in an alley.

Mitchell: So you mean she was moving out? You were helping her move out?

Connelly: That's where I threw it.

Mitchell: Oh, that's where you threw it. Why'd you throw her stuff in an alley?

Connelly: Why'd I burn the van up the other day?

Mitchell: I don't know. I don't know anything about a van. Tell me about that.

Connelly: My '87 G20 van.

Mitchell: Yeah.

Connelly: That they found (inaudible) torched over there in South Omaha.

Mitchell: Yeah.

Connelly: They seen me running from it with whatever I could carry.

Mitchell: Why did that happen?

Connelly: Because it had her in it. It had her in it.

. . . .

Mitchell: What do you mean you had her? You gave her a ride?

Connelly: I had her in it for 3 or 4 hours. Gave her a ride to Fremont. Dumped her in the fucking ditch. Don't nobody care about that girl, dude?

Mitchell: Is she alive?

Connelly: No, she's not.

At about 5½ minutes into the interview, Mitchell sent the detective out of the interview room. Connelly then stated that his legs were sunburned because he was outside for 2 hours the day before, contemplating jumping off a bridge to his death. The following exchange occurred:

Mitchell: Why's that? Why would you do that?

Connelly: . . . If I smothered her . . . if I smothered her and told her that's the best way to go out of all the ways to get killed, I oughta be able to man up and do it to myself right after.

Mitchell: So is that what happened to her?

Connelly: She got a duct-taped mask and she's laying in Fremont at the end of a road in a ditch.

. . . .

Mitchell: What? Do you know what road you were driving on?

Connelly: It ain't covered. She's not covered up . . . that's the fucked up part.

Mitchell: What is she wearing?

Connelly: Duct tape.

Connelly starts to cry as he recounts how he "duct-taped" her, told her he was not going to rape her, and explained he just wanted to take "her money and her dope," but that things got out of hand. Approximately 45 minutes into the interview, a homicide unit detective, David Preston, took over and led the remainder of the interview.

## Preston Interview

Preston obtained Connelly's date of birth and address, and for the first time, he read Connelly his *Miranda* rights and asked if, having been informed of his rights, he would still be willing to speak with him. Connelly answered yes, and Preston filled out a rights advisory form, which Connelly did not sign. Preston showed Connelly a map of Fremont, Nebraska, to assist in finding Jeanna Wilcoxen's location. Preston then asked Connelly to "start back from the beginning" and to explain "what happened actually." While recounting his story, Connelly made reference to a "beast" and hearing voices:

6:49:18 P.M.

Connelly: All this shit she's been through. It was just perfect . . . I told her either way, the beast gets her or I get her, this is perfect (inaudible) right here.

Preston: A beast, what are you referring to?

Connelly: Just like, I don't know, the beast, the hunger.

Preston: Your hunger?

Connelly: Doesn't feel like me. It doesn't feel like me at all. It feels like two or three versions of people (inaudible) that I pissed off somehow. I don't really realize how I pissed them off but it felt like them when the actual incident happened, when I'm giving verbal directions and telling her all this shit, being aggressive to maintain control of the situation but staying calm. The staying calm

part was me, that was like, so it was like one, two, three . . . three driving forces, dude, just like dominating.

Preston: It wasn't emotionally you, it physically was you?

Connelly: It was me, emotionally, I'm not trying to make it deeper than it is. It was my buddy Chicken Bone and my buddy Kona, are floating around in my head, every time I spoke, I sounded like them. It was distinctive. It's like knowing the names to the voices you hear. Not crazy people who don't know the names. I wronged both these guys and I don't remember how or why they got so mad at me when we were such good buds in the beginning and what they're doing here and now involved in this and then my stay calmness on top of that was the end of her, it's what destroyed her. It's simple. I'm not trying to get all psychological and shit.

Connelly then went on to explain how he killed Wilcoxen. At the conclusion of Connelly's interview, because the location of Wilcoxen's body still could not be determined, Weidner, Pruett, and Preston took Connelly to Fremont in an attempt to locate Wilcoxen. Wilcoxen's body was eventually discovered in an area very close to what Connelly had described. Connelly also directed the officers to 53rd & Y Streets in Omaha, advising that was the location where the murder had occurred. He then took them to an alley at 34th & K in Omaha where they found a tablet computer belonging to Wilcoxen that Connelly had discarded. Connelly then led Preston to Council Bluffs, Iowa, and to Columbus, Nebraska, to look for Wilcoxen's cell phone and his cell phone, but attempts to locate the cell phones were unsuccessful. The State later charged Connelly with first degree murder and tampering with physical evidence.

## Motion to Suppress

Connelly filed a motion to suppress the statements he made to law enforcement. Connelly argued in support of his motion that (1) the statements were obtained without Connelly's

being properly advised of his right to counsel and his right against compulsory self-incrimination; (2) the statements were obtained without a knowing, intelligent, and voluntary waiver of his right to counsel and his right against compulsory self-incrimination; (3) the statements were not voluntary in that they were the product of threats, coercion, or inducements of leniency practiced upon him by law enforcement; and (4) the statements were the fruit of an unlawful arrest.

In a written order, the district court denied Connelly's motion to suppress. First, the district court found that probable cause existed to support a warrantless arrest of Connelly. Second, the district court found Connelly's pre-*Miranda* statements made to law enforcement were voluntary and not the result of an interrogation. The court determined the overall demeanor of Connelly's interview indicated that Connelly was voluntarily providing information to law enforcement and that thus, Mitchell was not interrogating Connelly. Further, the court pointed out that when Mitchell inquired about Connelly's swollen legs, he responded that he had sustained the injuries from "'dumping her body in Fremont.'" The court noted there was no reason that Mitchell should have reasonably expected that her question would likely elicit an incriminating response. The district court further found that Connelly's pre-*Miranda* statements were admissible under the public safety exception, also referred to as the "rescue doctrine," to the *Miranda* requirements.[1]

Third, for the sake of completeness, the district court found that even if Mitchell's pre-*Miranda* interview amounted to an interrogation, Connelly's post-*Miranda* interview would still be admissible because it did not rise to the level of a two-step interrogation. Fourth, the district court found that under the totality of the circumstances, Connelly knowingly and voluntarily waived his *Miranda* rights. Fifth, the district court found

---

[1] See *New York v. Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984).

that the State met its burden in proving, by a preponderance of the evidence, that Connelly's confession was voluntary. The court determined there was no evidence presented to suggest Connelly's confession was the product of threats, coercion, or inducements of leniency. The court noted that instead, Connelly was cooperative with law enforcement and often volunteered information beyond what was requested.

## Trial and Sentencing

A jury found Connelly guilty of first degree murder and tampering with physical evidence. The court sentenced Connelly to consecutive terms of life imprisonment without the possibility of parole for the first degree murder conviction and of 2 to 2 years' imprisonment for the tampering with physical evidence conviction. Connelly appeals.

## ASSIGNMENTS OF ERROR

Connelly assigns, consolidated and restated, that (1) the district court erred in overruling the motion to suppress both his pre-*Miranda* and post-*Miranda* statements and (2) there was insufficient evidence to prove, beyond a reasonable doubt, Connelly's statements were made voluntarily.

## STANDARD OF REVIEW

[1] In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*,[2] an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.[3]

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020). See *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010).

## ANALYSIS

### No Custodial Interrogation

Connelly argues his confession to Mitchell was a "non-*Mirandized*" statement made during a custodial interrogation because Mitchell's questions were designed to elicit an incriminating response from him. Neither party contests that Connelly was in custody during each interview. As such, we focus on whether Connelly was subject to an interrogation by law enforcement. For the reasons set forth below, we affirm the trial court's denial of Connelly's motion to suppress his pre-*Miranda* statements, because we find Connelly volunteered those statements and was not subject to an interrogation.

[2] *Miranda* prohibits the use of statements derived during custodial interrogations unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.[4] The safeguards provided by *Miranda* "'come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.'"[5]

[3,4] This court, in *State v. Rodriguez*,[6] stated that under the *Miranda* rule, a "custodial interrogation" takes place when questioning is initiated by law enforcement after a person has been taken into custody or is otherwise deprived of his or her freedom of action in any significant way. We have also stated that the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.[7] An

---

[4] *State v. Rodriguez*, 272 Neb. 930, 726 N.W.2d 157 (2007). See *Miranda, supra* note 2.

[5] *Bormann, supra* note 3, 279 Neb. at 326, 777 N.W.2d at 835.

[6] See *Rodriguez, supra* note 4.

[7] *Id*.; *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000). See *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

objective standard is applied to determine whether there is an interrogation within the meaning of *Miranda*.[8]

[5] The relevant question to be asked is, "'Would a reasonable and disinterested person conclude that police conduct, directed to a suspect or defendant in custody, would likely elicit an incriminating response from that suspect or defendant?'"[9] If the answer is yes, then there is interrogation requiring the recitation of *Miranda* warnings.[10] However, we have excluded from the definition of interrogation a police officer's course of inquiry related to and responsive to a volunteered remark by the accused.[11]

In *Rodriguez*, while in custody, the defendant made incriminating statements to a police officer before the officer could finish advising him of his *Miranda* rights.[12] The defendant's remarks were made in an abrupt, rambling manner and not in response to any questioning by the officer. We determined, after a review of the interview tape, that the officer made several remarks that seemed focused toward calming the defendant rather than eliciting information, including telling him that he believed him.[13] We held that "[s]tatements made in a conversation initiated by the accused or spontaneously volunteered by the accused are not the result of interrogation and are admissible."[14] We affirmed the trial court's admittance of the defendant's statements because the statements were spontaneous, excited remarks, which were not the result of police compulsion.[15]

---

[8] *Bormann, supra* note 3.

[9] *Id.* at 327, 777 N.W.2d at 836 (quoting *State v. Gibson*, 228 Neb. 455, 422 N.W.2d 570 (1988)).

[10] *Bormann, supra* note 3.

[11] *Buckman, supra* note 7. See, also, *State v. Lamb*, 213 Neb. 498, 330 N.W.2d 462 (1983).

[12] *Rodriguez, supra* note 4.

[13] *Id*.

[14] *Id*. at 944, 726 N.W.2d at 171.

[15] *Rodriguez, supra* note 4.

In *State v. Lamb*,[16] after being placed in a holding cell and before any *Miranda* warnings had been given to him, the defendant told the police officer that he shot his wife. The defendant then asked the officer, "'How would you like it?'" to which the officer replied, "'What do you mean by that?'"[17] The defendant then replied, "'I got tired of seeing her suffer so I shot her.'"[18] The officer later testified that at the time he asked the question, he was concerned about whether the defendant was uncomfortable, ill, or angry about being placed in the holding cell. We agreed with the trial court in the case that the officer's question was a neutral and spontaneous one, not one calculated to obtain a confession. We also determined the officer's question did not place the defendant under a compulsion to speak because the defendant was the one who initiated the conversation and the officer simply requested clarification of the defendant's statement.[19]

The facts concerning Connelly's statements to Mitchell are substantially the same as the statements made in both *Rodriguez* and *Lamb*.[20] A review of the interview tape shows an agitated Connelly volunteering incriminating statements before his *Miranda* warnings could be read to him.

Mitchell's first question to Connelly concerned his red and swollen legs. Connelly responded that it was from "dumping [Wilcoxen's] body." Mitchell's question was a neutral and spontaneous question not intended to elicit a confession, and Connelly's statement was spontaneously volunteered. The interview tape also shows that Connelly appeared frustrated that the officers only cared about cars, rather than about a missing woman. This is evident when Connelly tells Mitchell that Pruett would not "listen to a damn word," to which

---

[16] *Lamb, supra* note 11.

[17] *Id.* at 501, 330 N.W.2d at 465.

[18] *Id.*

[19] See *id.*

[20] See, *Rodriguez, supra* note 4; *Lamb, supra* note 11.

Mitchell simply tells him that she will listen to him. Mitchell's limited inquiry cannot be characterized as a knowing attempt to elicit an incriminating statement from Connelly. When Mitchell did ask Connelly clarifying questions, they were often related to and responsive to Connelly's volunteered statements. At the time of these questions, law enforcement was not yet aware of the murder. There is no evidence in the record that Connelly was under any compulsion to speak about the murder.

Accordingly, although Connelly was in custody and his *Miranda* rights had not yet been read to him, his statements to Mitchell were not made in response to a custodial interrogation. Therefore, the district court did not err in finding that no custodial interrogation took place prior to the recitation of Connelly's *Miranda* rights.

## Pᴜʙʟɪᴄ Sᴀꜰᴇᴛʏ Exᴄᴇᴘᴛɪᴏɴ

The district court found the public safety exception, also referred to as the "rescue doctrine," which has been adopted by the U.S. Supreme Court, to be an appropriate exception to admit Connelly's pre-*Miranda* statements.[21] However, neither the rescue doctrine nor the public safety exception has yet been adopted by Nebraska appellate courts.

In *New York v. Quarles*,[22] the U.S. Supreme Court held that a public safety exception to the *Miranda* requirements applies when police ask a subject questions necessary to protect the public or police from immediate danger. Because we determine that Connelly's statements were not the result of police questioning, we need not address the applicability of the public safety exception. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it.[23]

---

[21] See *Quarles, supra* note 1.

[22] *Id.*

[23] *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019), *cert. denied* ___ U.S. ___, 140 S. Ct. 545, 205 L. Ed. 2d 345 (2019).

## POST-*MIRANDA* STATEMENTS

Connelly argues his post-*Miranda* statements made to Preston should be suppressed because detectives deployed an "ask first, warn later" tactic disapproved of by the U.S. Supreme Court in *Missouri v. Seibert*,[24] and because the *Miranda* warnings he received did not cure the damage that was done.

In *Seibert*, the U.S. Supreme Court considered a police protocol in which a suspect was interrogated without *Miranda* warnings until the suspect confessed, at which point, the officer would give *Miranda* warnings, ask for a waiver, and get the suspect to repeat the pre-*Miranda* confession.[25] The Court explained that the underlying assumption with the "question-first" tactic was that

> with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.[26]

The plurality opinion held that such tactic effectively threatens to thwart the purpose of *Miranda* by reducing the risk that a coerced confession would be admitted.[27]

However, as we have already determined, there was no pre-*Miranda* interrogation by Mitchell, and as such, there was no "question-first" tactic here. Therefore, the district court did not err in determining Connelly's post-*Miranda* interview was admissible because it did not rise to the level of a two-step interrogation.

---

[24] *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004).

[25] *Id.*

[26] *Id.*, 542 U.S. at 613.

[27] *Seibert, supra* note 24. See, also, *Miranda, supra* note 2.

Voluntariness of Statements

Connelly's final assignment of error is that there was insufficient evidence presented to the jury to support its conclusion that his statements were voluntary.

[6] The especially damning nature of a confession requires the State to prove that an accused's statement was voluntary before it is admissible.[28] In making this determination, a totality of the circumstances test is applied, and the determination reached by the trial court will not be disturbed on appeal unless clearly wrong.[29]

[7] To meet the requirement that a defendant's statement, admission, or confession was made freely and voluntarily, the evidence must show that such statement, admission, or confession was not the product of any promise or inducement— direct, indirect, or implied—no matter how slight. However, this rule is not to be applied on a strict, per se basis. Rather, determinations of voluntariness are based upon an assessment of all of the circumstances and factors surrounding the occurrence when the statement is made.[30]

[8,9] Connelly relies on our decision in *State v. Dickson*,[31] where we cited to the Supreme Court's decision in *Rhode Island v. Innis*[32] and stated that mental illness, like age, education, and intelligence, is a relevant factor in the totality test when evaluating the voluntariness of a statement. However, we also stated that no per se rule invalidates the volunteered statement of a mentally ill defendant.[33] We held that such statement is subject to the general rule that a statement freely and voluntarily given without any compelling influences is admissible.[34]

---

[28] See *State v. Walker*, 242 Neb. 99, 493 N.W.2d 329 (1992).

[29] *State v. Garner*, 260 Neb. 41, 614 N.W.2d 319 (2000).

[30] *Walker, supra* note 28.

[31] *State v. Dickson*, 223 Neb. 397, 389 N.W.2d 785 (1986).

[32] *Innis, supra* note 7.

[33] *Dickson, supra* note 31.

[34] See *id.*

Connelly argues that his statements about hearing voices, his uncorroborated statements about discarding his cell phone in Columbus and disposing of evidence in Council Bluffs, his confusion while searching for Wilcoxen's body near Fremont, and his erratic jumping from one subject to another indicated a mental illness sufficient to make his incriminating statements involuntary. However, a review of the interview tape indicates that Connelly described his crimes in detail, that his statements tracked chronologically, and that he understood what he was saying. Additionally, no evidence was offered to indicate that Connelly suffered from a mental illness or that he was under the influence of drugs or alcohol at the time the statements were given. Neither was there evidence that Connelly's confession was the product of threats, coercion, or inducements of leniency.

Furthermore, the district court instructed the jury that it must disregard any statement from Connelly if it found that the State did not prove beyond a reasonable doubt that Connelly understood what he was saying and freely and voluntarily made the statement under all surrounding circumstances. An appellate court does not resolve conflicts in the evidence, pass on credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[35] Connelly's argument that his statements were not made voluntarily is without merit.

## CONCLUSION

For the foregoing reasons, we affirm the order of the district court denying Connelly's motion to suppress. We conclude that Connelly's pre-*Miranda* statements were made voluntarily and not in response to a custodial interrogation. We further conclude there was sufficient evidence for a jury to find Connelly made his post-*Miranda* statements voluntarily.

Affirmed.

---

[35] *State v. Ferrin*, 305 Neb. 762, 942 N.W.2d 404 (2020).