Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/30/2021 12:10 AM CDT

State of Nebraska, appellee, v. Thomas
E. Johnson, Jr., appellant.
___ N.W.2d ___

Filed February 5, 2021.    No. S-19-1226.

1.  **Motions to Suppress: Confessions: Constitutional Law: Miranda
    Rights: Appeal and Error.** In reviewing a motion to suppress a state-
    ment based on its claimed involuntariness, including claims that law
    enforcement procured it by violating the safeguards established by the
    U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct.
    1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part
    standard of review. Regarding historical facts, an appellate court reviews
    the trial court's findings for clear error. Whether those facts meet con-
    stitutional standards, however, is a question of law, which an appellate
    court reviews independently of the trial court's determination.
2.  **Identification Procedures: Due Process: Appeal and Error.** A district
    court's conclusion whether an identification is consistent with due proc-
    ess is reviewed de novo, but the court's findings of historical fact are
    reviewed for clear error.
3.  **Verdicts: Insanity: Appeal and Error.** The verdict of the finder of fact
    on the issue of insanity will not be disturbed unless there is insufficient
    evidence to support such a finding.
4.  **Sentences: Appeal and Error.** Absent an abuse of discretion by the trial
    court, an appellate court will not disturb a sentence imposed within the
    statutory limits.
5.  **Judgments: Words and Phrases.** An abuse of discretion occurs when a
    trial court's decision is based upon reasons that are untenable or unrea-
    sonable or if its action is clearly against justice or conscience, reason,
    and evidence.
6.  **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v.
    Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), pro-
    hibits the use of statements derived during custodial interrogation unless

the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination.

7. \_\_\_\_: \_\_\_\_: \_\_\_\_. The safeguards provided by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.

8. \_\_\_\_: \_\_\_\_: \_\_\_\_. The safeguards of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), ensure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process. If the suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease.

9. **Miranda Rights: Right to Counsel: Police Officers and Sheriffs: Self-Incrimination.** In order to require cessation of custodial interrogation, the subject's invocation of the right to counsel must be unambiguous and unequivocal.

10. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** Under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), a "custodial interrogation" takes place when questioning is initiated by law enforcement after a person has been taken into custody or is otherwise deprived of his or her freedom of action in any significant way.

11. \_\_\_\_: \_\_\_\_: \_\_\_\_. The term "interrogation" under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

12. \_\_\_\_: \_\_\_\_: \_\_\_\_. An objective standard is applied to determine whether there is an interrogation within the meaning of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

13. **Identification Procedures: Due Process: Police Officers and Sheriffs.** When considering whether due process prohibits the admission of an out-of-court identification at trial, the trial court must first decide whether the police used an unnecessarily suggestive identification procedure. If they did, the court must next consider whether the improper identification procedure so tainted the resulting identification as to render it unreliable and therefore inadmissible.

14. **Constitutional Law: Identification Procedures: Due Process.** The Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement.

15. **Trial: Identification Procedures: Police Officers and Sheriffs: Motions to Suppress.** Suppression of identification evidence on the basis of undue suggestion is appropriate only where the witness' ability to make an accurate identification is outweighed by the corrupting effect of improper police conduct. When no improper law enforcement activity is involved, it suffices to test the reliability of identification testimony at trial, through the rights and opportunities generally designed for that purpose, such as the rights to counsel, compulsory process, and confrontation and cross-examination of witnesses.

16. **Identification Procedures.** A determination of impermissible suggestiveness of an identification procedure is based on the totality of the circumstances.

17. **Criminal Law: Insanity: Proof.** Generally, under Nebraska's common-law definition, the insanity defense requires proof that (1) the defendant had a mental disease or defect at the time of the crime and (2) the defendant did not know or understand the nature and consequences of his or her actions or that he or she did not know the difference between right and wrong.

18. ____: ____: ____. Under Neb. Rev. Stat. § 29-2203(1) (Reissue 2016), the defendant carries the burden to prove the insanity defense by a preponderance of the evidence.

19. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

20. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

21. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Douglas County: HORACIO J. WHEELOCK, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Allyson A. Mendoza for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Thomas E. Johnson, Jr., appeals his convictions and sentences in the district court for Douglas County for five counts of robbery, five counts of use of a weapon (not a firearm) to commit a felony, one count of assault in the second degree, and one count of attempted escape. Johnson claims on appeal that the district court erred when it overruled his motion to suppress statements he made while in custody and evidence of witness identifications from the photographic lineups (photo lineups), when it found that he had not proved his defense of insanity, and when it imposed excessive sentences. We reject each of Johnson's assignments of error, and we therefore affirm Johnson's convictions and sentences.

## STATEMENT OF FACTS

Between June 15 and 21, 2015, a string of robberies took place at five different businesses in Omaha, Nebraska. Each robbery involved a knife being used to threaten the victim, and victims in all the robberies gave descriptions of the assailant that were similar in terms of race, age, height, weight, and hair. Three of the five robberies occurred when the victim was alone; in one robbery, there were two other individuals present; and in the final robbery, two employees were robbed. In most of the robberies, the assailant used the knife only to threaten the victims, but in one robbery, a struggle ensued and the assailant stabbed the victim in the upper arm, shoulder, and neck several times. During the struggle, the victim bit the assailant's hand.

Surveillance video from the robbery in which the victim had been stabbed was released to local media. Johnson's

stepdaughter contacted police to report that her son had seen the surveillance video on television and recognized Johnson as the suspect. She also reported that she had seen bite marks on Johnson's hand, which was consistent with reports that the stabbing victim had bitten the suspect's hand in the struggle. At approximately 7 a.m. on June 23, 2015, police officers went to the home that family members shared with Johnson. After officers spoke with family members, Johnson's wife directed them to where Johnson was sleeping. Officers woke Johnson and observed that he matched the physical description of the suspect and that he had bite marks on his hand.

Police officers took Johnson into custody and transported him to police headquarters to be interviewed by Det. Jon Martin, who was investigating the string of robberies. After Martin read Johnson his *Miranda* rights, Johnson agreed to speak with Martin. Johnson generally denied being involved in the robberies, and he asserted that he had injured his hand doing yardwork. Johnson acknowledged that the person shown in a photograph taken from the surveillance video looked like him.

Martin created a photo lineup that included a photograph of Johnson and photographs of five other men who fit Johnson's general description. While Johnson was being interviewed by Martin, another officer went to various locations to meet with witnesses from four of the five robberies. The officer administered photo lineups to six witnesses who all identified Johnson as the person who committed the robberies. The two victims in the fifth robbery spoke limited English and primarily spoke Spanish. Therefore, on a later day, Martin accompanied an officer who was fluent in Spanish to meet with the two separately. The Spanish-speaking officer administered photo lineups to those two victims, who both identified Johnson as the robber.

After the officer who conducted the six photo lineups on June 23, 2015, reported the identifications to Martin, Johnson was arrested and transported from police headquarters to

jail. As Johnson was being removed from a police vehicle to be taken into the jail, he ran from officers. The officers chased after and caught Johnson.

On July 16, 2015, the State charged Johnson with five counts of robbery and five counts of use of a weapon, not a firearm, to commit a felony. The State also charged Johnson with one count of assault in the second degree for the robbery in which the victim was stabbed and with one count of attempted escape for having run from officers when being taken to jail.

On February 10, 2016, based in part on a competency evaluation completed by Dr. Bruce Gutnik, the district court determined that Johnson was not competent to stand trial and committed him to the Lincoln Regional Center (LRC) for restoration of competency. On May 19, the court reviewed a report by Dr. Farid Karimi, who was treating Johnson at LRC, and determined that Johnson remained incompetent to stand trial and should stay committed to LRC. On August 19, based on a new report from Karimi, the court determined that Johnson was then competent to stand trial, and Johnson was returned to jail. However, Johnson later filed a new motion to determine competency, and on October 6, after reviewing a report by Gutnik, the court found that Johnson was no longer competent to stand trial and should be recommitted to LRC for restoration of competency. On May 5, 2017, the court found Johnson competent to stand trial based on a report by Karimi, and on May 16, Johnson filed notice pursuant to Neb. Rev. Stat. § 29-2203 (Reissue 2016) that he intended to rely on a defense of not responsible by reason of insanity.

Prior to trial, Johnson also moved to suppress certain evidence. Johnson moved to suppress statements he made to Martin while he was being held at police headquarters on the morning of June 23, 2015. He alleged that the statements were not freely and voluntarily given and were obtained in violation of his constitutional rights. Johnson also moved to suppress evidence of identifications made by witnesses based on the photo lineups. He alleged that the procedures used by

officers to obtain the identifications were unduly suggestive and prejudicial to his constitutional rights.

Martin testified at the suppression hearing regarding his investigation of the robberies. Turning to the morning of June 23, 2015, Martin testified that he was informed that Johnson was being brought to police headquarters by officers who had responded to reports from Johnson's family members. While waiting for Johnson to be brought in, Martin retrieved information regarding Johnson from the police computer system, including photographs of Johnson. Martin noted that Johnson fit the physical description of the suspect and that he "bore a very strong resemblance to the party that [Martin] had observed in the surveillance video" of one of the robberies. Martin used police software to create a photo lineup that included a photograph of Johnson and photographs of five other individuals with a similar appearance to Johnson's in terms of "gender, race, age, height and weight."

Martin then met with Johnson in an interview room at approximately 7:47 a.m. Martin began by obtaining general biographical information from Johnson. After determining that Johnson was responsive and did not appear to be suffering any sort of medical condition or to be under the influence of narcotics or alcohol, Martin read Johnson the police department's rights advisory form.

The court received into evidence at the suppression hearing the completed rights advisory form, which indicated that Johnson had been informed of his rights and that, knowing his rights, he was willing to talk to Martin. The court also received into evidence at the suppression hearing a video recording of Martin's interview and interactions with Johnson on June 23, 2015.

Martin testified that his interview of Johnson regarding the robberies began at approximately 7:53 a.m. About 5 minutes later, Johnson stated to Martin that the interview was over, but Johnson continued talking for some minutes thereafter. Martin testified that at approximately 8:03 a.m., Johnson stated

that Martin could speak with Johnson's lawyer. Martin testified that Johnson remained in the interview room until shortly after noon but that Martin did not further interview Johnson during that time. Martin testified that Johnson was alone in the room most of that time other than during certain brief interactions. Martin testified that at his request, police personnel entered the room in order to photograph Johnson's hand because Martin had noted injuries which were consistent with bite marks that were reported to have been sustained by the suspect in one of the robberies. Martin testified that at one point, he brought Johnson water and coffee and that at other times, other officers had responded to Johnson's requests to be taken to the bathroom and to adjust the temperature in the room.

The video recording that was received into evidence at the suppression hearing showed that at approximately 8:03 a.m., Johnson said he was done talking, and that Martin could conduct photo lineups or talk to Johnson's lawyer or "whatever." The video recording shows that Martin stopped talking and left the interview room shortly thereafter. However, Martin returned to bring Johnson a drink at approximately 9:45 a.m. When Johnson began asking about what the charges against him would be, Martin left to get a notepad and returned shortly thereafter. Martin and Johnson spoke for approximately 5 to 10 minutes. During that time, Martin informed Johnson of potential charges and informed Johnson that police would be obtaining a search warrant for Johnson's residence. Martin did not ask specific questions of Johnson, but Martin made statements to Johnson to the effect that Martin was willing to listen if Johnson wanted to explain what happened at the robberies. Johnson continued to deny involvement, and Martin left the room. Thereafter, at approximately 10:30 a.m., Johnson asked other officers if he could talk to a lawyer. When Martin next returned to the interview room, he informed Johnson that he was being arrested and set forth the charges. Johnson asked if they could talk more, but Martin said that they could not talk because Johnson had told other officers that he wanted to talk to a lawyer.

Martin also testified at the suppression hearing that during the hours that Johnson spent in the interview room, another police detective, Kerry Windels, was working on contacting witnesses to four of the robberies in order to administer the photo lineups that Martin had created. Martin testified that after Windels reported that all the witnesses from those four robberies had identified Johnson as the robber based on the photo lineups, Johnson was arrested at approximately 12:15 p.m. Martin and another detective transported Johnson from police headquarters to jail to be booked on robbery and assault charges. While they were moving Johnson from the vehicle to the jail, Johnson ran out the doors of the jail garage and did not respond to Martin's verbal orders. Martin and the other detective gave chase and caught Johnson a few feet outside the garage door.

Martin further testified that on June 25, 2015, he and another police officer, Sgt. Nick Yanez, met with the two victims of the fifth robbery, who spoke limited English. Martin had created a version of the photo lineup that included instructions and questions in Spanish but included the same photographs as the original English language version. Yanez administered the photo lineups to the two witnesses at separate locations. When Yanez administered the photo lineups, Martin was present but "stepped several feet away." Yanez reported to Martin that both witnesses had identified Johnson as the robber.

On cross-examination, Johnson elicited from Martin testimony that in July or August 2016, the Omaha Police Department had changed its procedures for conducting photo lineups. Martin testified that the changes included, inter alia, providing each photograph on a separate page rather than including all six photographs together on one page, showing a witness one photograph at a time and asking the witness to make a decision on each photograph before moving on to the next, and asking a witness after an identification had been made to state his or her level of certainty. Martin testified that the photo lineups in this case were conducted under the prior procedures.

Windels and Yanez both testified at the suppression hearing. Windels testified that on June 23, 2015, she administered photo lineups to six witnesses. Windels testified that she had no part in the creation of the photo lineups. Windels was not aware of any specifics of the robberies that were being investigated and was informed only of the locations in which she would find the witnesses. Windels met with three of the six witnesses at locations different from the locations in which she met any other witness. She met with three witnesses who were all witnesses to one of the robberies at the same location, but she immediately told the three witnesses she would need to separate them in order to administer the photo lineups. She told the witnesses that they should not talk with one another about the robbery or the identification of photographs. Windels administered a photo lineup to each witness while that witness was in a room with only Windels and the other witnesses were in a room in which they could not see or hear what was occurring in the room where the photo lineup was being administered. Windels read the admonishment and questions provided on the photo lineups to each of the six witnesses with whom she met, and each of the six witnesses identified the photograph of Johnson as depicting the robber.

Yanez testified that he was qualified to act as a Spanish language translator. On June 25, 2015, Martin asked Yanez to accompany him to speak with two witnesses and to conduct photo lineups. Martin informed Yanez only that he was investigating a series of robberies and that the two witnesses spoke little English. Yanez testified that the Spanish language admonishment and questions provided on the photo lineups he administered included the same information used in the English language photo lineups. Both witnesses identified the photograph of Johnson as depicting the robber. Yanez testified that Martin did not speak with the witnesses while Yanez was administering the photo lineups.

After the suppression hearing, the district court filed an order in which it overruled Johnson's motion to suppress as to

both his statements to Martin and evidence of the identifications from the photo lineups. Regarding Johnson's statements to Martin, the court found that after Martin read Johnson the rights advisory, Johnson "readily waived" such rights and agreed to talk with Martin. The court found no evidence to indicate that Martin's questions were not appropriate or to support a finding that Martin's behavior or questioning was unduly coercive. The court therefore found that the State had proved that "Johnson's statements and *Miranda* waiver were voluntary and in no way a product of coercive questioning or methods offensive to due process." The court further found that when Johnson invoked his right to counsel, Martin appropriately stopped questioning him.

Regarding the witness identifications, the court determined that the photo lineups in this case were not unduly suggestive. The court found no evidence of improper suggestive circumstances arranged by law enforcement. The court noted that Johnson's photograph did not stand out from the others included in the photo lineups in any way and that neither Windels nor Yanez encouraged the witnesses to choose one photograph over another. The court further noted that neither Windels nor Yanez knew which photograph depicted the suspect or who the "'target'" was. The court rejected Johnson's argument that the police department's subsequent change in its procedure for conducting photo lineups indicated that the procedure used in this case was impermissibly suggestive. The court found that there was "nothing fatal in the presentation of the photo lineups" and that the procedure further protected Johnson's due process rights "by having law enforcement officers who knew nothing about the case and did not know the identity of the 'target' administer all the lineups."

Although it concluded that the photo lineups were not unduly suggestive, the court further considered the indicators of reliability of the identifications. The court noted that the witnesses had identified Johnson in photo lineups "only days after the robberies," that each witness had "individualized contact" with the robber for a period of minutes which included

"close contact" and "adequate lighting," that the witnesses "unequivocally identif[ied]" Johnson, and that there was no indication of suggestiveness by the officers administering the photo lineups. The court concluded that indicators of reliability were sufficient to outweigh any improper suggestiveness.

Johnson waived a jury trial, and the matter was submitted to the court in a stipulated bench trial. The State offered into evidence various exhibits, including exhibits that had previously been admitted at the suppression hearing. Johnson renewed the objections he raised in his motion to suppress his statements to Martin and evidence of the identifications from the photo lineups. The court overruled the objection and allowed the exhibits into evidence. In addition to the identifications and the recording of the June 23, 2015, interview by Martin at police headquarters that had been reoffered from the suppression hearing, other evidence admitted for the bench trial included police reports regarding the robberies, as well as surveillance videos from two of the robberies. The court also admitted a transcript of testimony by Martin, Windels, and Yanez from the suppression hearing.

The court did not receive live testimony regarding the elements of the charged offense, but it did receive live testimony regarding Johnson's insanity defense. Johnson offered testimony by Gutnik, and in response, the State called Karimi as a witness. The court received into evidence reports by both Gutnik and Karimi regarding their respective evaluations of Johnson to determine his sanity or insanity at the time of the charged offenses.

Gutnik testified regarding his education, training, and experience as a psychiatrist. He testified that he had evaluated Johnson four times. The first three times, in November 2015, September 2016, and April 2017, were to determine Johnson's competence to stand trial. The fourth time, in May 2017, was to determine his sanity or insanity at the time of the alleged offenses. Gutnik's reports from all four evaluations were received into evidence. In connection with the competency evaluations, Gutnik had diagnosed Johnson with

certain conditions, including schizoaffective disorder and post-traumatic stress disorder. In the first two evaluations, Gutnik opined that Johnson was not competent to stand trial, and in the third evaluation, Gutnik opined that Johnson was competent to stand trial.

After the court found Johnson competent to stand trial, Gutnik conducted an evaluation on May 10, 2017, to determine whether Johnson was sane or insane at the time of the alleged offenses. During Gutnik's interview of Johnson for the sanity evaluation, Johnson told Gutnik that at the time of the offenses, he had been hearing a voice in his head which was that of a pirate named "Pablo." Johnson told Gutnik that "Pablo" asked him to find buried treasure and threatened to kill him and his family if he did not comply with the request. Johnson told Gutnik that he had retrieved buried treasure from various locations at the direction of "Pablo" and that he carried a knife when retrieving treasure. Johnson told Gutnik that he had both auditory and visual hallucinations on a daily basis but that their occurrence had decreased.

In his report following the May 2017 evaluation, Gutnik opined that Johnson was psychotic at the time of the alleged crimes. He further opined that as a result of his condition, Johnson was unable to determine the rightness or wrongness of his actions, that he was unable to understand the consequences of his behavior, and that he did not understand the nature and quality of his actions. Gutnik stated that Johnson was delusional and thought that he was a pirate who was forced to find treasure because voices had threatened him and his family. Gutnik concluded that in his opinion, within a reasonable degree of medical certainty, Johnson was insane at the time of the alleged crimes.

The State called Karimi to testify in response to Johnson's insanity defense. Karimi testified regarding his education, training, and experience as a psychiatrist. He testified that he had been employed as a forensic psychiatric at LRC while Johnson was committed to the facility and that he had opportunity to evaluate Johnson during that time. Karimi testified

regarding evaluations he had completed in 2016 to determine Johnson's competence to stand trial. In his May 2016 report, Karimi determined that Johnson was not competent, but Karimi noted a possibility of malingering by Johnson and stated that there was a good possibility that Johnson's competency would be restored in the near future. In June 2016, Karimi completed a report opining that Johnson was then competent to stand trial. Based on Karimi's June 2016 report, the court found Johnson competent to stand trial and ordered him moved from LRC to jail. However, Johnson was recommitted to LRC after the court in October 2016 found, based on Gutnik's report, that Johnson was again not competent to stand trial. Karimi testified at trial regarding Johnson's treatment during his time at LRC and efforts that were taken at LRC to restore his competence.

Karimi also testified regarding his evaluation and report in March 2017, which led the court to determine that Johnson was again competent to stand trial. In the report, Karimi diagnosed Johnson as malingering. Karimi based this diagnosis on testing, as well as his own interactions and experiences with Johnson and the observations of other staff and professionals at LRC. Karimi noted in particular that no changes in Johnson's conditions had been observed after LRC discontinued his antipsychotic medication.

Karimi also testified regarding his October 2017 report in which he concluded that Johnson did not qualify for an insanity defense at the time of the offenses. Based on his experience with Johnson at LRC and his diagnosis of Johnson as malingering, Karimi opined that Johnson was faking symptoms of psychosis and had made up the story of the pirate named "Pablo" and buried treasure. Karimi opined that it was possible that at the time of the offenses, Johnson may have been under the influence of drugs which would have given rise to hallucination and delusions, but Karimi noted that a temporary condition caused by ingestion of drugs would not qualify under the legal standard for insanity. Karimi also allowed that Johnson may have been suffering depression at the time of

the offenses, but Karimi stated that depression would not have impaired Johnson's mental capacity to the point that he did not understand the nature and consequences of his actions or did not know the difference between right and wrong. Karimi noted that Johnson's behavior at the time of the offenses indicated that he knew that what he was doing was wrong and that he attempted to avoid punishment.

After testimony was completed, the parties submitted written arguments to the district court. The court announced its verdict in court on October 22, 2019, and filed a written order that same day. The court found that the State had proved each element of the charged offenses beyond a reasonable doubt. The court then considered Johnson's defense that he was insane at the time he committed the offenses. The court set forth the elements of an insanity defense and noted that Johnson had the burden to prove the defense. The court stated that it had heard testimony by Gutnik and Karimi, whose respective professional opinions "diverge[d] drastically" with regard to whether Johnson suffered from a mental illness and whether he was not responsible by reason of insanity. The court found both Gutnik and Karimi to be credible witnesses; however, the court found Karimi's methodology and his diagnosis of Johnson as malingering to be more accurate and reliable than Gutnik's opinion. The court noted that Gutnik had met with Johnson a total of four times, whereas Karimi and his team of professionals at LRC had "spent years living with . . . Johnson and had more of an opportunity to observe him and study his behaviors." The court therefore accorded greater weight to Karimi's testimony and the conclusions set forth in Karimi's reports on Johnson's competency and his sanity at the time of the offenses. The court particularly noted that LRC had not observed any bizarre behaviors or indication of hallucinations after staff stopped giving Johnson antipsychotic medication without informing Johnson they were discontinuing the medication. The court noted this evidence, as well as testing which indicated that Johnson was intentionally exaggerating

his symptoms and wanted to stay at LRC. The court noted with favor Karimi's conclusion, in short, that either Johnson was "completely faking his psychotic symptomology" or, alternatively, "at the time of his criminal offenses he could have been high on PCP that could have caused very vivid hallucinations and delusions." The court concluded that the evidence showed that Johnson was malingering, and the court further found that Johnson failed to prove that he was legally insane at the time of the commission of the offenses. The court therefore found Johnson guilty of all the charged offenses.

The court thereafter held a sentencing hearing at which it considered the presentence investigation, as well as arguments by Johnson and the State. Johnson argued that although the court had rejected his insanity defense, the evidence related to his competence and sanity identified mental health issues and cognitive deficits, as well as the possibility that he was under the influence of drugs at the time of the offenses and that these should be considered as mitigating factors in his sentencing. Johnson urged sentencing that would allow him an opportunity for rehabilitation. The court determined that Johnson was not an appropriate candidate for probation and therefore imposed sentences of imprisonment. The court sentenced Johnson to imprisonment for 35 to 40 years for each of the five convictions for robbery and for 1 to 2 years for each of the five convictions for use of a weapon. The court ordered that the five sentences for robbery be served concurrently with one another, and it ordered that the five sentences for use of a weapon be served consecutively to the sentences for the underlying felonies and to one another. The court sentenced Johnson to imprisonment for 19 to 20 years for the second degree assault conviction and ordered that the sentence be served concurrently with the sentences for the robbery convictions. On the attempted escape conviction, the court originally sentenced Johnson based on sentencing statutes in effect at the time of sentencing. The court later corrected its error because the original sentence was outside the range set forth in the sentencing statutes in effect at

the time of the offense. The court sentenced Johnson to imprisonment for 20 months to 5 years for the attempted escape conviction and ordered that the sentence be served concurrently with the sentences for robbery and the sentence for second degree assault.

Johnson appeals his convictions and sentences.

## ASSIGNMENTS OF ERROR

Johnson claims that the district court erred when it (1) overruled his motion to suppress statements that he made to Martin, (2) overruled his motion to suppress evidence of the identifications from the photo lineups, (3) found he had not proved the insanity defense, and (4) imposed excessive sentences.

## STANDARDS OF REVIEW

[1] In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *State v. Connelly*, 307 Neb. 495, 949 N.W.2d 519 (2020).

[2] A district court's conclusion whether an identification is consistent with due process is reviewed de novo, but the court's findings of historical fact are reviewed for clear error. *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020).

[3] The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020).

[4,5] Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits. *State v. Senteney*, 307 Neb. 702, 950 N.W.2d

585 (2020). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

## ANALYSIS

Johnson's first two assignments of error relate to evidence admitted at the stipulated bench trial over his renewed objections based on issues raised in his motion to suppress. We note as a preliminary matter that sufficiency of the evidence to convict is relevant even when the defendant has asserted an insanity defense. See *State v. Stack, supra* (considering both assignment of error that evidence was not sufficient to support conviction and assignment of error that there was not sufficient evidence to conclude that defendant was not legally insane). We have stated that "[i]t is well settled that when a defendant pleads insanity and offers evidence on that issue, the plea is an implicit, although not legally operative, admission of the State's charges." *State v. Urbano*, 256 Neb. 194, 203, 589 N.W.2d 144, 152 (1999) (citing *State v. Vosler*, 216 Neb. 461, 345 N.W.2d 806 (1984)). Because the plea of insanity is not a legally operative admission of the charges, the State still must prove the elements of the charged offenses. Therefore, issues regarding the admission of evidence to prove the elements of the charged offenses are relevant even when the defendant has asserted an insanity defense.

*District Court Did Not Err When It Overruled*
*Johnson's Motion to Suppress Evidence*
*of Johnson's Custodial Statements.*

Johnson first claims that the district court erred when it overruled his motion to suppress statements he made to Martin while in custody prior to his arrest. He argues that Martin continued to interrogate him after he had unambiguously invoked his right to counsel and that the district court erred when it found that Martin stopped questioning him after he requested counsel. We determine that the interrogation was not

in violation of *Miranda* safeguards, and we conclude that the district court did not err when it overruled Johnson's motion to suppress and allowed the statements into evidence.

[6,7] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogation unless the prosecution demonstrates the use of procedural safeguards that are effective to secure the privilege against self-incrimination. *State v. Connelly*, 307 Neb. 495, 949 N.W.2d 519 (2020). The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *State v. Connelly, supra*.

[8,9] The *Miranda* safeguards ensure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process. *State v. Said*, 306 Neb. 314, 945 N.W.2d 152 (2020). If the suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease. *Id*. In order to require cessation of custodial interrogation, the subject's invocation of the right to counsel must be unambiguous and unequivocal. *Id*.

There is no dispute that at the beginning of the interrogation on June 23, 2015, at approximately 7:52 a.m., Martin read the *Miranda* advisory to Johnson, and that Johnson waived his rights. However, Johnson argues that he unambiguously invoked his right to counsel at 8:03 a.m., when he told Martin, "you can talk to my lawyer." Johnson contends that the district court agreed this was the point when he invoked his right to counsel and that it erroneously concluded Martin stopped interrogating Johnson after his invocation of the right to counsel. Johnson notes that although Martin temporarily stopped questioning him, Martin returned at around 9:45 a.m. and continued the interrogation by attempting to get him to admit that he had committed the robberies.

[10-12] We agree with Johnson to the extent that he contends that Martin continued the interrogation after 9:45 a.m. We have stated that under the *Miranda* rule, a "custodial

interrogation" takes place when questioning is initiated by law enforcement after a person has been taken into custody or is otherwise deprived of his or her freedom of action in any significant way. *State v. Connelly, supra*. We have also stated that the term "interrogation" under *Miranda v. Arizona, supra*, refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Id*. An objective standard is applied to determine whether there is an interrogation within the meaning of *Miranda v. Arizona, supra*. *State v. Connelly, supra*.

After Martin resumed speaking with Johnson at approximately 9:45 a.m., he did not explicitly ask Johnson questions about the robberies. However, Martin told Johnson that police were getting a search warrant, and he made statements to Johnson to the effect that this was Johnson's chance to explain what had happened at each robbery. We think that such statements, in the context of telling Johnson that police were gathering evidence against him, were words that were "reasonably likely to elicit an incriminating response from the suspect" and therefore would be considered "'interrogation'" for purposes of *Miranda* safeguards. See *State v. Connelly*, 307 Neb. at 505, 949 N.W.2d at 527.

Although we agree with Johnson that Martin continued the interrogation after 9:45 a.m., we do not agree that this interrogation occurred after Johnson had unambiguously invoked his right to counsel. Johnson asserts the invocation occurred at 8:03 a.m., when he told Martin that the conversation was over and that Martin could put him in a photo lineup, or talk to Johnson's lawyer, or "whatever." We do not read this statement as an unambiguous invocation of the right to counsel.

The right to counsel was described in the *Miranda* advisory that was signed by Johnson as "the right to consult with a lawyer and have the lawyer with [him] during the questioning" and for the court to appoint a lawyer if he could not afford

one. This is consistent with case law in which we have said that a similar advisement was "sufficient to convey to the defendant his right to counsel during the questioning even if he could not afford one, and sufficient to convey the consequences of forgoing that right." *State v. Burries*, 297 Neb. 367, 390-91, 900 N.W.2d 483, 504-05 (2017) (citing *Patterson v. Illinois*, 487 U.S. 285, 108 S. Ct. 2389, 101 L. Ed. 2d 261 (1988)). Because the focus of the right to counsel is the defendant's right to consult with counsel and have counsel present for questioning of the defendant, Johnson's statement that Martin could talk to Johnson's lawyer was not an unambiguous invocation of Johnson's right to counsel. Johnson did not say that he wanted to have a lawyer appointed or to consult with a lawyer or to have a lawyer present for the questioning. Instead, he told Martin that Martin could talk to his lawyer. Although it is possible Johnson's statement could be interpreted as stating that he only wanted to talk through his lawyer, the statement was not an unambiguous statement of such intent. That is particularly true when considered in context, because in the same sentence, Johnson said Martin could conduct a photo lineup or talk to Johnson's lawyer or "whatever." Thus, it was more an expression of what Martin could do than an expression of what Johnson wanted to do.

We note that before Martin told Johnson after 9:45 a.m. that he would listen if Johnson wanted to explain what happened in the robberies, Martin reminded Johnson of the *Miranda* advisory and ensured Johnson understood those rights were still in effect. We further note that Martin stopped the resumed interrogation within approximately 10 minutes because Johnson continued to deny involvement. After that time, at around 10:30 a.m., Johnson told officers other than Martin that he wanted to speak with a lawyer. Johnson's statements at that point were unambiguous invocations of the right to counsel. The next time Martin spoke to Johnson after that, Martin's purpose was to advise Johnson both that he was being arrested and of the nature of the charges against him. When Johnson

asked Martin whether they could talk more, Martin appropriately responded that he could no longer speak about the robberies, because Johnson had told other officers that he wanted to speak with a lawyer.

We acknowledge, as Johnson asserts, that given the district court's narrative concerning the conversation, the district court's suppression order can be read as finding that Johnson invoked his right to counsel at 8:03 a.m. However, when the court made its findings, it simply stated that when "Johnson invoked his right to counsel . . . Martin appropriately stopped questioning . . . Johnson." The court did not specify in its order a finding of the time when Johnson invoked his right of counsel. Under our standard of review, we review findings of fact for clear error and review independently the determination whether constitutional standards were met. See *State v. Connelly*, 307 Neb. 495, 949 N.W.2d 519 (2020). We therefore review independently the district court's determination that Martin stopped questioning Johnson after Johnson unambiguously invoked his right to counsel. The record shows that Johnson did not unambiguously invoke his right to counsel until approximately 10:30 a.m. and that Martin did not thereafter continue the interrogation.

We therefore conclude that the district court did not err when it concluded that the interrogation did not violate *Miranda* safeguards and when it therefore overruled the motion to suppress statements Johnson made to Martin on June 23, 2015. We reject this assignment of error.

*District Court Did Not Err When It Overruled*
*Johnson's Motion to Suppress Evidence of the*
*Identifications From the Photo Lineups.*

Johnson next claims that the district court erred when it overruled his motion to suppress evidence of the witness identifications from the photo lineups. He argues that the identifications were irreparably tainted by unduly suggestive procedures used in conducting the photo lineups. We conclude that the

court did not err when it admitted evidence of the witness identifications from the photo lineups.

[13] The U.S. Supreme Court has stated a two-part test for determining whether due process prohibits the admission of an out-of-court identification at trial: "'First, the trial court must decide whether the police used an unnecessarily suggestive identification procedure. . . . If they did, the court must next consider whether the improper identification procedure so tainted the resulting identification as to render it unreliable and therefore inadmissible.'" See *State v. Newman*, 290 Neb. 572, 579, 861 N.W.2d 123, 131-32 (2015) (quoting *Perry v. New Hampshire*, 565 U.S. 228, 132 S. Ct. 716, 181 L. Ed. 2d 694 (2012)).

[14,15] The Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement. *State v. Pope*, 305 Neb. 912, 943 N.W.2d 294 (2020). Suppression of identification evidence on the basis of undue suggestion is appropriate only where the witness' ability to make an accurate identification is outweighed by the corrupting effect of improper police conduct. *Id*. When no improper law enforcement activity is involved, it suffices to test the reliability of identification testimony at trial, through the rights and opportunities generally designed for that purpose, such as the rights to counsel, compulsory process, and confrontation and cross-examination of witnesses. *Id*.

[16] A determination of impermissible suggestiveness of an identification procedure is based on the totality of the circumstances. *State v. Newman, supra*. Under the totality of the circumstances in this case, the district court found that the photo lineups in this case were not unduly suggestive. The court found no evidence of improper suggestive circumstances arranged by law enforcement and noted that Johnson's photograph did not stand out from the others included in the photo lineups, that the officers conducting the photo lineups did

not encourage the witnesses to choose one photograph over another, and that the officers did not know which photograph depicted the suspect or who the "'target'" was.

In our de novo review, we determine that the district court's findings are not clearly erroneous. We also agree with the district court's reasoning that the police department's subsequent change in its procedure for conducting photo lineups did not indicate that the procedure used in this case was impermissibly suggestive. The fact that the police department later made changes to improve its procedure and to comply with newly enacted law does not invalidate prior photo lineups that were not otherwise impermissibly suggestive. We conclude that the photo lineups were not unduly suggestive and were consistent with due process.

Because there is no evidence that the identifications were procured under unnecessarily suggestive circumstances arranged by law enforcement, there was no need for a preliminary judicial inquiry into the reliability of the witnesses' identifications. *State v. Pope, supra*. We therefore need not review the district court's further determination that indicators of reliability of the witness identifications were sufficient to outweigh any improper suggestiveness.

We conclude that the district court did not err when it overruled the motion to suppress the witness identification evidence and when it admitted the evidence at trial. We therefore reject this assignment of error.

*There Was Sufficient Evidence to Support the District Court's Finding That Johnson Failed to Prove Insanity Defense.*

Johnson next claims that the district court erred when it rejected his insanity defense. He generally argues that Gutnik's testimony was more credible and should have been given greater weight than Karimi's testimony. We conclude that there was sufficient evidence to support the district court's finding that Johnson was not insane at the time he committed the offenses.

[17,18] Generally, under Nebraska's common-law definition, the insanity defense requires proof that (1) the defendant had a mental disease or defect at the time of the crime and (2) the defendant did not know or understand the nature and consequences of his or her actions or that he or she did not know the difference between right and wrong. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020). The defendant carries the burden to prove the insanity defense by a preponderance of the evidence. See § 29-2203(1). The verdict of the finder of fact on the issue of insanity will not be disturbed unless there is insufficient evidence to support such a finding. *State v. Stack, supra*.

Both Johnson and the State presented testimony by their respective experts regarding the issue of Johnson's sanity at the time of the offenses. Johnson presented the testimony of Gutnik, who generally opined that Johnson was psychotic at the time of the alleged crimes and that as a result of his condition, Johnson was unable to determine the rightness or wrongness of his actions, was unable to understand the consequences of his behavior, and did not understand the nature and quality of his actions. Gutnik concluded that Johnson was insane at the time of the alleged crimes. In response, the State called Karimi, who generally opined that Johnson was faking symptoms of psychosis and that at the time of the offenses, he was not suffering any condition that would have impaired his mental capacity to the point that he did not understand the nature and consequences of his actions or did not know the difference between right and wrong. Karimi allowed that Johnson may have been "using PCP" at the time of the offenses but noted that a temporary condition caused by ingestion of drugs would not qualify under the legal standard for insanity.

Johnson generally argues on appeal that Gutnik's opinion established that he was insane at the time of the offenses, because his testimony was credible and his opinion regarding insanity was consistent with prior evaluations Gutnik performed in order to determine Johnson's competence to stand

trial. Johnson generally argues that Karimi's opinion and testimony were less credible because they were inconsistent with Johnson's extensively documented mental health history. Johnson further asserts Karimi's testimony was affected by bias he developed while treating Johnson and an ingrained belief that Johnson was malingering. Johnson cites other factors that he argues affected Karimi's credibility. Johnson concludes that Gutnik's opinion established legal insanity and that Karimi's testimony did not credibly rebut that finding.

In the order announcing its verdict in this case, the district court thoroughly discussed its finding that Johnson was not legally insane at the time of the offenses. The court found both Gutnik and Karimi to be credible witnesses, although their respective professional opinions "diverge[d] drastically" with regard to whether Johnson suffered from a mental illness and whether he was not responsible by reason of insanity. The court, however, accorded greater weight to Karimi's opinion because it found Karimi's methodology and his diagnosis of Johnson as malingering to be more accurate and reliable than Gutnik's opinion. The court therefore found that Johnson failed to prove by the greater weight of the evidence that he was legally insane at the time of the commission of the offenses.

The opinions of Gutnik and of Karimi on the issue of legal insanity were in direct conflict with one another, and it was the province of the district court as the fact finder in this bench trial to resolve that conflict. See *State v. Stack, supra* (stating appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, or reweigh evidence; such matters are for finder of fact). While the court found both Gutnik and Karimi to be credible witnesses, the court as fact finder accorded greater weight to Karimi's opinion, and in its order, the court explained its reasoning for how it resolved the conflict in professional opinions. Because it was the district court's province to determine credibility, resolve conflicts, and weigh the evidence, we as an appellate court consider only

whether there was sufficient evidence to support the finding of the court as fact finder. Given the opinions and reasoning set forth by Karimi, the record contained sufficient evidence for the district court to conclude that Johnson was not legally insane at the time of the offenses.

We conclude that there was sufficient evidence to support the district court's finding regarding Johnson's insanity defense. We therefore reject this assignment of error.

*District Court Did Not Abuse Its Discretion*
*When Imposing Sentences.*

Johnson finally claims that the district court imposed excessive sentences. He argues that the court did not adequately consider relevant mitigating factors. We find no abuse of discretion in the sentencing, and we therefore reject this claim.

Johnson was convicted of five counts of robbery, Class II felonies under Neb. Rev. Stat. § 28-324(2) (Reissue 2016); five counts of use of a deadly weapon other than a firearm to commit a felony, Class II felonies under Neb. Rev. Stat. § 28-1205(1)(b) (Reissue 2016); one count of second degree assault, a Class III felony under Neb. Rev. Stat. § 28-309(2) (Cum. Supp. 2014) at the time of the offense; and one count of attempted escape, a Class IV felony under Neb. Rev. Stat. § 28-912(5)(a) (Reissue 2008) and Neb. Rev. Stat. § 28-201(4)(d) (Cum. Supp. 2014). The offenses were committed between June 15 and 23, 2015, prior to the August 30 effective date of 2015 Neb. Laws, L.B. 605, and therefore, changes made by that amendment do not apply to these offenses. See Neb. Rev. Stat. § 28-105(8) (Supp. 2015). At the time of the offenses, the sentencing range for a Class II felony was imprisonment for 1 to 50 years; for a Class III felony was imprisonment for 1 to 20 years, a $25,000 fine, or both; and for a Class IV felony was imprisonment for a maximum of 5 years, a $10,000 fine, or both. § 28-105 (Cum. Supp. 2014). The robbery and weapon convictions were Class II felonies, and the district court sentenced Johnson to imprisonment for 35 to 40 years for each of the robberies and for

1 to 2 years for each of the weapon convictions. The second degree assault conviction was for a Class III felony, and the district court sentenced Johnson to imprisonment for 19 to 20 years. The attempted assault conviction was for a Class IV felony, and the district court sentenced Johnson to imprisonment for 20 months to 5 years. The court ordered all of the sentences to be served concurrently with one another except for the sentences for the weapon convictions, which, as required by § 28-1205(3), the court ordered to be served consecutively to one another and to all the other sentences imposed.

[19] The sentences imposed by the court were therefore within statutory limits. Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Price*, 306 Neb. 38, 944 N.W.2d 279 (2020). We therefore consider whether the court abused its discretion when it imposed those sentences.

[20,21] Johnson argues that the district court abused its discretion when it sentenced him because it did not adequately consider relevant mitigating factors. In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Johnson argues specifically that the court failed to adequately consider his social background, education, and mentality when it imposed sentences of imprisonment for a total of

40 to 50 years. He asserts that the record is replete with evidence of his extensive history of substance abuse, as well as a history of being a victim of verbal, physical, and sexual abuse since his childhood. He argues that these experiences had a profound impact on his development and his long history of mental illness, which is also documented in the record. Johnson further notes evidence that he attended special education classes and that he had an estimated IQ of 73 and showed significant cognitive impairment. Johnson argues that these factors rendered him vulnerable to making poor decisions and that the lengthy total sentence imposed by the court depreciated the recognition that his mental health and substance abuse issues required rehabilitative measures. Johnson asserts that these mitigating factors warrant a lesser sentence.

The record indicates that Johnson made similar arguments at the sentencing hearing and that there was evidence in the record for the court to be aware of the mitigating factors asserted. At the sentencing hearing, the district court stated that it had considered relevant factors including, as relevant to Johnson's excessive sentence arguments, Johnson's "mentality, education and experience, [and] social and cultural background." But the court also considered other relevant factors, including Johnson's "past criminal record [and] motivation for the offense[s], the nature of the offense[s,] and the violence involved in the commission of the offenses." Although the court did not extensively discuss its reasoning or its consideration of these factors, as the State notes, the record shows factors that support the sentences imposed, including testing that showed a high to very high risk to reoffend and a criminal history that included several robberies and burglaries that occurred prior to the series of robberies that gave rise to the present case.

We further note that while the sentences imposed for the robberies, the second degree assault, and the attempted escape were toward the top of the statutory ranges, the court lessened the severity of the sentencing by ordering these sentences to

be served concurrently rather than consecutively. Furthermore, with regard to the sentences for the weapons convictions, which were statutorily required to be served consecutively to one another and to the other sentences, the court imposed sentences of imprisonment of 1 to 2 years when the permissible maximum term of imprisonment was 50 years. By imposing short sentences for these convictions, which are required to be served consecutively to other sentences, the court significantly lessened the potential total term of imprisonment. Considering all the relevant factors and all the sentences imposed in this case, we think the sentences imposed were justified.

We conclude that the sentences imposed by the district court were not an abuse of discretion, and we therefore reject Johnson's claim that the district court imposed excessive sentences.

## CONCLUSION

We conclude that the district court did not err when it overruled Johnson's motion to suppress evidence of his statements to police and of the identifications from the photo lineups. We further conclude that the court did not err when it found that Johnson had not proved the insanity defense. We finally conclude that the court did not abuse its discretion in sentencing Johnson. We therefore affirm Johnson's convictions and sentences.

Affirmed.